Ashok CHAND;  Premila Mudaliar
Chand, Petitioners,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 98–70541.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 17, 2000

Filed Aug. 2, 2000

Miguel D. Gadda, San Francisco, California, for the petitioner.

Nancy E. Friedman, Office of Immigration Litigation, U.S. Department of Justice, Washington, D.C., for the respondent.

Before: POLITZ,[1] REINHARDT, and HAWKINS, Circuit Judges.

REINHARDT, Circuit Judge:

Petitioner Ashok Chand seeks review of the BIA's decision denying his claim for asylum and withholding of deportation. We grant Chand's petition for review and hold that he is eligible for asylum.[2]

## I.

Chand is a Hindu Indian from Fiji who worked as a foreman in a shop of cabinet makers; he was not politically active. He lived in a small village on the island of Latouka. Two-thirds of the people in the village were ethnic Fijians while the other one-third were Indian Fijians. The village was run by a chief who was a good friend of Chand's father. The chief afforded Chand's family a measure of security in the village. Chand stated that there were no problems between the Indian Fijians and ethnic Fijians prior to 1987, but that the situation changed dramatically following the coups.[3] During the period immedi-

---

1. Honorable Henry A. Politz, Senior Circuit Judge for the Fifth Circuit Court of Appeals, sitting by designation.

2. Chand's wife, Premila Mudaliar Chand, filed an asylum claim derivative of her husband's. The IJ and BIA treated their cases together, and we do the same. Because we hold that Ashok Chand is eligible for asylum, we hold that Premila Chand is also eligible for asylum.

3. The ugly events surrounding the coups in Fiji, including the rapes and beatings of Indian citizens and the fire bombings of their houses, have been described in detail in this court's prior opinion in *Singh v. INS*, 94 F.3d 1353, 1356–57 (9th Cir.1996) (hereinafter *R.J. Singh* ). Sadly, at the time of this writing, another military takeover is taking place in Fiji. It appears that this one, like the prior coups, has succeeded in crushing a democratically elected government composed in part of ethnic Indians. *See Fiji's Ethnic Indians Live*

ately after the military takeover, the Fijian army raided and robbed the homes and businesses of Indians in the village, and also burned the temple which Chand and other Indians used.

However, Chand's problems were not limited to the months following the coups. He continued to suffer acts of persecution on account of his race and religion in the years between 1987 and his departure from Fiji in February of 1993. Chand was the victim of violent attacks on several occasions. One day (in 1988) Chand was playing soccer on a Sunday. A group of soldiers approached the players and broke up the game, forcing the players to run barefoot on a hot coal tar highway. The soldiers also beat Chand on his left leg with the butt of a rifle.

▪ Chand was attacked by Fijian soldiers again, in 1991. On that occasion, Chand was cutting firewood with his father in preparation for Chand's wedding. Soldiers approached them and asked Chand's father if they had paid the royalty for the wood. His father responded by noting that the soldiers asked only Indians, and not ethnic Fijians, about the royalty. In response, the soldiers started beating both Chand and his father.[4]

Soldiers attacked Chand on still another occasion, in 1992. At that time, Chand was the secretary of a charitable youth club that was running a bazaar during Easter—Chand was organizing the club's stand, which was run by teenagers. Soldiers attacked the stand, beat both Chand and the teenagers, and took the group's

money as well as the sweets and coffee they were purveying.

On another occasion, ethnic Fijians assaulted Chand's father while he was harvesting sugar cane. His father died waiting for the bus to take him to the hospital. Chand did not say where he was when his father was killed.

In addition to being the victim of direct physical attacks, Chand suffered several incidents of economic persecution. Chand was robbed by ethnic Fijians while going to or coming from work on three different occasions in 1990. When he complained to the police about these robberies, they took his statement but never took any other action, saying that he should talk to his village chief about his problems. In 1991, while Chand was on a longer trip involving work, ethnic Fijians robbed him and a group of his co-workers of their equipment. Finally, in early 1992, while his wife was alone at home, soldiers came to the family's house and asked his wife for money. When she replied that she did not have any, they vandalized the outside of the house, damaging the walls.

The final acts which led to Chand's decision to flee Fiji came at the end of 1992. Despite problems that many Indians had experienced throughout the islands, Chand had remained relatively safe while in his home village because the village's chief had been a good friend of his father, and had provided the family with a measure of protection. However, after the chief died, Chand's protection evaporated. The Fijians who owned the land he had lived on

in *Fear*, AP Online, June 1, 2000. For purposes of this decision, however, we consider only the events that are reflected in the record before the BIA.

4. In the affidavit submitted as part of the asylum application, Chand stated that this incident occurred in 1991. However, during his hearing Chand stated that it occurred in 1992. In both the affidavit and the hearing, Chand stated that his father died on March 8, 1991. At the hearing, neither the IJ, the INS attorney, nor Chand's own attorney questioned him about the inconsistency between his statement that his father died in 1991 and

that he was beaten while with his father in 1992, and the IJ did not mention it in his decision. The BIA noted the inconsistency, but nonetheless treated Chand's testimony as credible. We do so as well, for two reasons. First, Chand has not been put on notice that his credibility is an issue in this case. *See Campos–Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir.1999). Second, minor inconsistencies and inconsistencies that do not go to the heart of the asylum claim cannot support adverse credibility determinations. *See Akinmade v. INS*, 196 F.3d 951, 954 (9th Cir. 1999); *Martinez–Sanchez v. INS*, 794 F.2d 1396, 1400 (9th Cir.1986).

"raised his rent" from $100 per month to $3,000 per month. Chand was forced to leave the land. After forcing him to leave, the Fijian landlords also took his furniture and possession of the house, which belonged to him.[5] Chand and his wife took shelter with friends for roughly one month after being displaced, and then came to the United States.

In addition to the transcript of the hearing and Chand's original application for asylum with the accompanying affidavit, the record also contains several secondary sources regarding the situation in Fiji. The State Department's 1994 "Profile for Asylum Claims and Country Conditions" for Fiji noted that the Fijian Constitution assured the political dominance of ethnic Fijians through a system of racially divided voting. The profile also contained the following passage regarding racial crime in Fiji:

> Neither the Amnesty International 1992 annual report nor the Department of State's annual country report on Fiji has found evidence of widespread human rights violations in Fiji. Ethnic and communal differences, however, do cause significant social tension in Fiji. In some instances, this tension results in the harassment and intimidation of ethnic Indians by ethnic Fijians. The police are sometimes either unable or unwilling to prevent such harassment, which is frequently at a personal level difficult for the authorities to control or prevent. Indo–Fijians are also sometimes the victims of crime based on race. Inadequate police protection contributes to the frequency and seriousness of these incidents.

The Profile also stated that the government effectively upholds basic human rights, that there were no reports of political killings, and that, "despite the flawed nature of the Fijian political structure, we are not aware of any evidence that the Government of Fiji takes action against or fails to protect individuals solely because they are members of the Indo–Fijian community." It concludes with the following statement:

> There are acknowledged racial tensions in Fiji. Residents of that country from both ethnic communities, however, are leading tranquil and productive lives throughout Fiji. Indo–Fijians of Moslem, Hindu, Sikh and Christian faiths are economically active and engage in business and professional activities.

The record also contains a letter from a desk officer sent to the Immigration Judge at the INS's request. The letter stated that, although there was considerable racial tension in Fiji and "isolated incidents do occur," "there is no evidence that members of the Indian community have been consistently mistreated in the manner claimed by this applicant." The letter acknowledged the problems in Fiji that occurred around the time of the coup, stating that "political developments in Fiji in 1987 did result in some mistreatment but this was of short duration and has not been repeated." It added that emigration from Fiji "is prompted by economic considerations, not by human rights abuses." The letter's analysis concluded with a legal assessment. It stated that while the incidents described by Chand "are unfortunate and show a high level of prejudice, they do not appear to be the kind of mistreatment normally associated with asylum."

In addition to the documents from the State Department, the record contained a few articles from newspapers in Fiji. One, from 1994, prophetically described how the Prime Minister (who, as a military official, had led the coup in 1987) had subtly threatened the Indian community by referring to the possibility of another coup, "probably a bloody one." The Prime Minister also stated that it was wrong, accord-

---

**5.** Chand, like many Indians in Fiji, appears to have had a long-term lease for his land, on which he built his house. Thus, he owned his house but not the land on which it sat. Chand's testimony makes clear that the land-lords did not foreclose on the land. Rather, Chand was forcibly evicted from the land and was then unable to sell his house because it had been taken from him.

ing to Fijian custom, to imprison young men for crimes (other than crimes involving battle). Another article described the Prime Minister's statement that Fiji would be better off if the Indians just went back to India.

## II.

Chand and his wife entered the United States on temporary visitor visas, but overstayed their time and then applied for asylum and withholding of deportation.

After Chand's initial application for asylum was denied, he was placed in deportation proceedings, and presented his claim for asylum at a hearing before an Immigration Judge (IJ). The IJ found Chand's testimony vague as to certain dates, and suggested therefore that he had "some difficulty with the credibility of the respondent" insofar as Chand stated that the problems he faced occurred in 1992, rather than in 1991 or earlier.[6] However, the IJ acknowledged that Chand's testimony was substantiated by the fact that many Indians leaving Fiji had testified to similar events in other cases, conceded that there was "harassment, discrimination and significant annoyances" in Fiji, and stated that Indians were the victims of "severe criminal activity and that the police are not in as good control as they should be." Yet, the IJ did not believe that Chand had been or would be subject to persecution on

account of a protected ground. He therefore denied both asylum and withholding of deportation.

■ Chand appealed to the BIA. The BIA appears to have reviewed the IJ's decision de novo, and in any event did not explicitly adopt the IJ's decision.[7] After describing the facts, the BIA began its analysis with the conclusion that Chand's testimony was "not sufficiently detailed" and too "vague and general" to satisfy the burden of proof. The BIA then proceeded to analyze individually some, though not all, of the events Chand recounted, in an effort to explain why no one of the various incidents established eligibility for asylum or withholding.[8]

■ The BIA stated that because Chand was playing soccer with ethnic Fijians, the soldiers' attack on him at that time could not have been on account of a protected ground,[9] and that it in any event did not rise to the level of persecution.[10] Regarding the firewood incident, the BIA stated that the soldiers beat Chand and his father because they had questioned the soldiers, and not because of a protected ground. The BIA added that Chand's testimony about this event was too inconsistent to meet his burden of proof because he stated that the event occurred in 1992, even though he later stated that his father died in 1991.[11] The BIA then stated that

6. Neither the BIA nor the IJ made an explicit adverse credibility finding. *See Hartooni v. INS*, 21 F.3d 336, 342 (9th Cir.1994). In fact, neither the IJ nor the BIA even suggested that the events Chand described did not happen to him; they only suggested that his account of when the events happened may have been incorrect.

7. If the BIA had adopted the IJ's decision while adding its own reasons, we would have to review both decisions. Where the BIA engages in de novo review, we review only its decision. *See Cordon–Garcia v. INS*, 204 F.3d 985, 990 (9th Cir.2000).

8. We find the omissions in the BIA's discussion of Chand's claim puzzling. For example, the BIA did not discuss the fact that Chand was displaced from his home, despite having included that event in its description of the facts.

9. Presumably the BIA had race in mind, and not religion. The soldiers objected to Chand's playing soccer on the Sabbath.

10. For the latter proposition, the BIA cited *Prasad v. INS*, 47 F.3d 336 (9th Cir.1995) (*K. Prasad*). As we explain below, that case does not support the proposition for which the BIA cited it. Moreover, an event that does not constitute persecution when viewed in isolation may contribute to such a finding when viewed as part of a pattern of conduct.

11. It is apparent from the record that Chand was simply in error in identifying the date of the event as 1992. It is clear that there was no attempt at deception. In his affidavit, Chand had stated that the assault occurred in 1991.

the theft of his group's "money and merchandise" (presumably at the charity event held during Easter) did not rise to the level of persecution.[12] The BIA next added that the three robberies Chand suffered did not rise to the level of persecution and were not on account of a protected ground, and that Chand's testimony about the burning of his temple also did not show that the occurrence was on account of a protected ground, as opposed to the product of "general conditions of violence."[13]

Chand petitioned for review.

### III.

■ Because Chand was placed in deportation proceedings prior to April 1, 1997, and his deportation order became final after October 30, 1996, his case is governed by the transitional rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). Therefore, we have jurisdiction to consider his petition for review under 8 U.S.C. § 1105a as amended by IIRIRA § 309(c)(4).

■ Petitions for review from BIA decisions in asylum cases are reviewed under the substantial evidence standard. We review the BIA's legal determinations in accordance with the principles outlined in *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See INS v. Aguirre–Aguirre,* 526 U.S. 415, 119 S.Ct. 1439, 1445, 143 L.Ed.2d 590 (1999). We will reverse the BIA's decision that an applicant is ineligible for asylum only if "a reasonable fact-finder would have to conclude that the requisite fear of persecution existed." *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

■ Because several recent decisions of this court have exhaustively described the eligibility requirements for asylum applicants, we will not describe those requirements in detail. *See Navas v. INS,* 217 F.3d 646, 655–56 (9th Cir. 2000); *Ladha v. INS,* 215 F.3d 889, 896–97 (9th Cir.2000); *Mgoian v. INS,* 184 F.3d 1029, 1034–35 (9th Cir.1999). In the case before us, Chand seeks to establish eligibility because he was persecuted in the past. "In order to establish eligibility for asylum on the basis of past persecution, an applicant must show: (1) an incident, or incidents, that rise to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either 'unable or unwilling' to control." *Navas,* 217 F.3d at 655–56. For purposes of this appeal, the central questions are whether Chand has shown that the harm he suffered rises to the level of persecution, and whether he has shown that he was persecuted on account of a ✦ protected ground. If the answer to both these questions is "yes", we must also consider whether the INS has established. a change in country conditions sufficient to rebut the presumption that arises of a well-founded fear of future persecution. That presumption can be overcome only by an individualized showing that because of the change that has occurred, the particular individual no longer has reason to fear that he would be subjected to persecution if he returned to the country he fled.

### IV.

■ Despite the BIA's ruling, we think it evident that the harm Chand suffered rises to the level of persecution, and conclude that no reasonable fact-finder could have found otherwise. Chand was the victim of violence on three occasions, on all of which he was physically attacked by soldiers from the Fijian military. Physical harm has consistently been treated as persecution. *See de Guinac v. INS,* 179 F.3d 1156, 1161 (9th Cir.1999). Where

---

**12.** The BIA neglected to discuss Chand's testimony that he was beaten during this incident. *See also supra* n. 10.

**13.** The BIA also stated that Chand did not state who burned the temple. This was incorrect, as Chand clearly stated that the Fijian military burned it.

an applicant suffers such harm on more than one occasion, and as in this case is victimized at different times over a period of years, the harm is severe enough that no reasonable fact-finder could conclude that it did not rise to the level of persecution, particularly when the incidents are considered along with the other acts to which Chand was subjected. *See Korablina v. INS*, 158 F.3d 1038, 1044 (9th Cir. 1998) (cumulative effect of several instances of violence and harassment compel finding of persecution).[14]

Chand was also robbed repeatedly, and testified that the police were not interested in dealing with this continuing problem. In addition, Chand's house was attacked by Fijian soldiers when his wife was at home alone, resulting in the destruction of his property (and great terror for his wife). We have treated persistent robbery under threatening conditions as persecution in another case involving an Indian Fijian asylum applicant, where there was evidence that the Fijian government was unable or unwilling to control such crime. *See Surita v. INS*, 95 F.3d 814, 817–18 (9th Cir.1996). Such evidence exists here as well.

▮ Chand ultimately fled Fiji after his house and all the furniture in it were taken from him when he and his wife were forced to vacate their home by their ethnic Fijian landlords. Upon being displaced, they were forced to stay with friends because they had become, literally, homeless. We have recognized that purely economic harm can rise to the level of persecution where there is "a probability of deliberate imposition of substantial economic disadvantage" upon the applicant on account of a protected ground. *Kovac v. INS*, 407 F.2d 102, 107 (9th Cir.1969); *Gonzalez v. INS*, 82 F.3d 903, 910 (9th Cir.1996). Economic persecution has been credited as an important part of asylum claims on numerous occasions. *See, e.g., Korablina*, 158

F.3d at 1045 (loss of job and substantial career obstacles because of anti-Semitism); *Gonzalez*, 82 F.3d at 910 (loss of ration card and business's inability to buy inventory constitute economic persecution); *Desir v. Ilchert*, 840 F.2d 723, 727–28 (9th Cir.1988) (finding persecution in part because of petitioner's inability to earn livelihood because of refusal to comply with corrupt government practices); *cf. Samimi v. INS*, 714 F.2d 992, 995 (9th Cir.1983) (holding that seizure of petitioner's father's land and livelihood could contribute to a finding of persecution).

▮ When considering an asylum claim, we consider cumulatively the harm an applicant has suffered. An applicant may suffer persecution because of the cumulative effect of several incidents, no one of which rises to the level of persecution. *See Shirazi–Parsa v. INS*, 14 F.3d 1424, 1428 (9th Cir.1994), *overruled on other grounds by Fisher v. INS*, 79 F.3d 955 (9th Cir.1996).[15] Here, the harm Chand suffered, including the economic injury, when considered cumulatively, clearly rises to the level of persecution.

▮ It is difficult to know on what basis the BIA concluded that Chand's suffering did not rise to the level of persecution, because the BIA made no attempt to assess Chand's claim cumulatively. Nonetheless, we discern two strands of argument that the BIA appears to have relied upon. First, the decision below suggests that Chand's testimony was too general and vague to satisfy the burden of proof. Our review of the record reveals no such problem. Chand's testimony was clear, generally consistent, and sufficiently detailed. While it is true that certain events could have been described in greater detail, the absence of such detail is insignificant on the record before us, particularly given that the IJ made no attempt to elicit a more specific description from Chand.

---

14. We also think it significant that Chand's temple was burned. *Cf. Surita*, 95 F.3d at 818.

15. The BIA erred to the extent that it considered each incident Chand suffered in isolation, without analyzing the cumulative harm Chand suffered.

The IJ had a duty, shared with Chand, to ascertain the information relevant to the asylum claim and to aid in the development of the record. *See Jacinto v. INS,* 208 F.3d 725, 732–33 (9th Cir.2000). Moreover, neither the IJ nor the BIA ever contended that Chand's testimony was generally lacking in credibility. Under such circumstances, any reasonable fact-finder would be compelled to conclude that the specificity of Chand's testimony was more than adequate to support his claim.

The BIA also appears to have believed that the result in Chand's case was foreclosed by our decision in *Prasad v. INS,* 47 F.3d 336 (9th Cir.1995) (*K. Prasad*). In *K. Prasad,* we denied an Indian Fijian asylum applicant's petition for review where the applicant had suffered a relatively mild beating in the immediate aftermath of the coups. We noted that he was detained for a short period, was not threatened, required no medical treatment, and presented no evidence that the Fijian government retained a continuing interest in him. *See id.* at 339–40.

Initially, we note that the BIA erred in its interpretation of *K. Prasad,* citing it for the proposition that the harm in that case did not constitute persecution, whereas we held only that the record did not *compel* the conclusion that the harm in the case constituted persecution. We made clear in *K. Prasad* that we would have upheld as reasonable a decision to grant asylum based on the single incident of violence in that case. *K. Prasad,* 47 F.3d at 340. Thus, the BIA was not bound by *K. Prasad* to reach the conclusion it did, regardless of whether or not the case, from our standpoint, is controlling.

In any event, *K. Prasad* is obviously distinguishable from this case. There we placed emphasis on the fact that the beating at issue was a single, non-serious incident, and that no one in Fiji had any

"continuing interest" in persecuting Prasad beyond that one event. *Id.* at 339. Any other reading of *K. Prasad* would make it difficult to reconcile with our consistent practice of finding persecution where the petitioner was physically harmed. *See de Guinac v. INS,* 179 F.3d 1156, 1161 (9th Cir.1999) (citing *Borja v. INS,* 175 F.3d 732 (9th Cir.1999) (en banc) and *Korablina v. INS,* 158 F.3d 1038 (9th Cir.1998)); *cf. Lata v. INS,* 204 F.3d 1241, 1245 (9th Cir.2000) (finding no persecution where Indian Fijian woman was once chased by ethnic Fijian youths who threw stones at her and may have threatened her with assault).

Here, Chand suffered multiple incidents of physical harm, as well as other kinds of hardship. Moreover, unlike in *K. Prasad,* where the sole incident of persecution on account of a protected ground occurred in September of 1987, in the immediate wake of the coups in Fiji, Chand faced acts of persecution that occurred at various times during the period from 1987 until the time he left.[16]

When analyzed cumulatively, Chand's claim is stronger than the claim we considered in *Surita,* 95 F.3d at 819, where we granted an Indian Fijian's petition for review and found her eligible for asylum. In that case, the petitioner was repeatedly robbed during one week and then threatened by soldiers on one occasion. *Surita,* 95 F.3d at 817. Unlike Chand, Surita was never physically harmed, and did not suffer for any length of time, because she left Fiji a few weeks after these incidents, which was only six or seven weeks after the first coup. *Id.* at 818.

The BIA also appears to have concluded that the harm Chand suffered did not rise to the level of persecution because it was not different from the "general conditions of violence" in Fiji. Howev-

---

**16.** The BIA, unlike the IJ, expressed no doubt as to Chand's claims that he suffered harm as late as 1992. Even if the IJ was correct to doubt that some of the events Chand described occurred in 1992, there can be no doubt from Chand's testimony that he was forced to leave his house only a month before he departed, in early 1993, and also no doubt that he suffered harm in 1991, which was four years after the coups.

er, we have held, both in the context of Indian Fijian asylum applicants and in other cases, that where the petitioner establishes that many members of his or her group are targeted for persecution, *less* of an individualized showing is required to qualify for asylum, not more. *See Avetova–Elisseva v. INS*, 213 F.3d 1192, 1202 (9th Cir.2000); *Singh v. INS (R.J. Singh)*, 94 F.3d 1353, 1359 (9th Cir.1996); *Kotasz v. INS*, 31 F.3d 847, 853 (9th Cir.1994); *see also* 8 C.F.R. § 208.13(b)(2)(i). This does not mean that all Indian Fijians are eligible for asylum. On the contrary, an Indian Fijian who has suffered only a single isolated incident of harm, or very little cumulative harm, cannot prevail simply because many Indians face oppressive conditions. *See Lata*, 204 F.3d at 1243; *Kumar v. INS*, 204 F.3d 931 (9th Cir.2000); *Singh v. INS*, 134 F.3d 962 (9th Cir.1998) (*B. Singh*); *K. Prasad*, 47 F.3d at 336. Nevertheless, that other Indian Fijians have faced persecution similar to the persecution Chand suffered strengthens, rather than weakens, his claim. *See Avetova–Elisseva*, 213 F.3d at 1202 (holding that an applicant who is a member of a disfavored group, i.e. a group that is subject to systematic mistreatment, can establish eligibility for asylum without making the same showing he would have to make were he from a group that did not suffer such systematic mistreatment).

There is no doubt that Chand has made a sufficient showing of persecution. We hold that any reasonable fact-finder would have to conclude that Chand suffered "persecution" within the meaning of the asylum statute and governing regulations.

**V.**

We think it equally clear that the BIA erred in concluding that the harm Chand suffered was not "on account of" a protected ground. At the outset, it appears that the incidents which were *unquestionably* on account of a protected ground, which the Board did not mention in its decision, may well be sufficient for Chand to establish eligibility for asylum. The BIA did not dispute that the attack on Chand that occurred at the bazaar during Easter was on account of race and religion, and (as we noted earlier) the Board said nothing at all about why it did not credit his testimony that he was displaced from his home on account of his race.[17] The violent Easter attack coupled with the displacement of Chand from his home was enough to satisfy the "on account of" requirement.

In addition, the BIA's analysis of other crucial incidents was misguided. The Board held that the soldiers' attack on Chand for playing soccer on a Sunday could not have been on account of a protected ground because he was playing with ethnic Fijians. However, it is apparent from Chand's testimony that the persecution was on account of religion, not race; the soldiers attacked the players for playing on a *Sunday*, which is a day of religious significance for Christian ethnic Fijians, but not for Hindus like Chand.[18]

The INS does not defend the BIA's argument, but instead argues that there is no religious persecution in Fiji, citing a portion of the State Department

---

17. Chand also testified that ethnic Fijians are trying to take land from Indians as part of a general move to return land to ethnic Fijian control. The testimony makes clear that Chand's displacement occurred in that context.

18. Even if the ethnic Fijians with whom Chand was playing were Christian, Chand would still be able to make out a claim for religious persecution. The soldiers attacked Chand, and all the other players, for playing on a day that they considered to be a religious holiday. That some of the players were will-

ing to play because they were Hindu (or Muslim or Sikh) while others were willing to play because they did not believe in so rigid a view of Christianity does not undermine the claim that the soldiers' behavior was motivated by a desire to enforce religious conformity. *Cf. Maini v. INS*, 212 F.3d 1167, 1175 (9th Cir. 2000) ("If an applicant can establish that others in his group persecuted him because they found him insufficiently loyal or authentic to the religious, political, national, racial, or ethnic ideal they espouse, he has shown persecution on account of a protected ground.").

Profile, which suggests that communities of different faiths happily co-exist in Fiji. First, we will not infer that a petitioner's otherwise credible testimony is not believable merely because the events he relates are not described in a State Department document. Credible testimony by itself is sufficient to support an asylum claim. *See Ladha*, 215 F.3d at 898–901. Second, while we have recognized that a State Department's Country Report (and we do not have such a Report in the record before us) is "perhaps the best resource" for country conditions information, *Kazlauskas v. INS*, 46 F.3d 902, 906 (9th Cir.1995), we have never assumed that all potentially relevant incidents of persecution in a country are collected in the State Department's documentation. As the Seventh Circuit recently explained, State Department "reports are brief and general, and may fail to identify specific, perhaps local, dangers to particular, perhaps obscure, individuals." *Galina v. INS*, 213 F.3d 955, 958–59 (7th Cir.2000).[19]

The BIA also erred when it held that the beating Chand suffered at the hands of soldiers when he and his father were cutting firewood was not on account of a protected ground. The BIA stated that the attack occurred because Chand's father questioned the soldiers. It is true that Chand's father's question appears to have precipitated the beating. However, Chand's father asked the soldiers why only Indians, and not ethnic Fijians, were subjected to the royalty for wood collection— his question was an attempt to challenge the discriminatory enforcement of the royalty. Had Chand's father not been Indian he would not have challenged the discriminatory enforcement, and might not have been asked to pay the royalty in the first place. Thus, it is clear that the soldiers'

attack on Chand and his father was motivated in part by the Chands' resistance to a racially discriminatory royalty, or at least by their assertion, as Indians, that they were the victims of discriminatory law enforcement. This constitutes persecution that was, at least in part, "on account of" race. *See Borja*, 175 F.3d at 735, 736 (holding that protected ground need only constitute *a* motive, not the *sole* motive, of persecution).

■ We have held in other contexts that resistance to discriminatory government action that results in persecution is persecution on account of a protected ground. For example, we found that the applicant had suffered persecution in *Desir*, 840 F.2d at 727–28, where he refused to pay money to corrupt quasi-governmental forces because he was opposed to the government, and then was punished as a result of his refusal to pay the money. Although having to pay the money might not have amounted to persecution, resisting the payment for political reasons and being beaten as a result was persecution on account of a political opinion. *Cf. Barraza Rivera v. INS*, 913 F.2d 1443, 1451 (9th Cir.1990) (finding cognizable persecution where applicant resisted conscription for religious and moral reasons, and therefore faced punishment). In the case before us, Chand and his father resisted racial discrimination, real or perceived, which in turn led to their persecution. This was persecution on account of a protected ground.

Finally, the BIA stated that the robberies Chand suffered could not support his claim because they were not on account of a protected ground. It is true that, according to Chand's testimony, the robbers

---

19. In the present proceeding, we have a State Department Profile and an individualized letter, neither of which carries as much weight as a Country Report. Moreover, we find the individualized letter from a State Department official regarding Chand's case troubling. The letter's dismissal of the events at the time of the coups as "some mistreatment," its assessment that the motive for Chand's depar-

ture was economic based solely on his asylum application, its failure to discuss any of the entrenched political discrimination and racial violence described in the Department's own Profile, and its explicit legal conclusion that Chand was not eligible for asylum, when taken together, serve to undermine our confidence in the objectivity of the letter itself.

never made their motive for robbing him entirely clear, and furthermore that Chand never explicitly alleged that he was robbed because of his race, although he noted that the robbers were ethnic Fijians, and at other places in his testimony described the general racial tension and discrimination faced by Indians in Fiji. Similarly, Chand did not state in so many words that the police did not protect him because of his race.

■ However, as the Supreme Court made clear in its seminal case on the subject, direct evidence of a persecutor's motives is not required to show persecution on account of a protected ground, only *some* evidence must be shown. *See INS v. Elias–Zacarias*, 502 U.S. 478, 483, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Here, the record is replete with evidence that Indians are the victims of racially motivated assaults and other crimes committed against them by ethnic Fijians, and that the Fijian police are sometimes either unwilling or unable to control such crime. The State Department's Profile says almost exactly that:

> [Ethnic difference] results in the harassment and intimidation of ethnic Indians by ethnic Fijians. The police are sometimes either *unable or unwilling* to prevent such harassment ... Indo–Fijians are also sometimes the victims of crime based on race. Inadequate police protection contributes to the frequency and seriousness of these incidents.

(emphasis added). In addition, the articles Chand submitted strongly suggest that the government of Fiji and even the Prime Minister implicitly condone crime against Indians. This information is more than sufficient to constitute "some evidence" that the crimes against Chand were *at least in part* racially motivated. *See Borja*, 175 F.3d at 735–36.

In this case, the evidence that Chand suffered harm because of his race and religion is simply overwhelming. We conclude that no reasonable fact-finder could find that he was not persecuted on account of a protected ground.

## VI.

As a result of Chand's having shown that he suffered past persecution, he is entitled to a presumption that he will be persecuted in the future. *See* 8 C.F.R. § 208.13(b)(1)(i); *Vallecillo–Castillo v. INS*, 121 F.3d 1237, 1240 (9th Cir.1996). However, because neither the IJ nor the BIA found that the harm Chand suffered rose to the level of persecution, they did not accord Chand the presumption, and therefore did not consider whether changed conditions in Fiji were sufficient to rebut it. In some cases in which the BIA failed to analyze the record regarding country conditions because it did not find the harm necessary to give rise to the presumption, we have remanded to allow it to do so. *See Del Carmen Molina v. INS*, 170 F.3d 1247, 1250 (9th Cir.1999). We have held, however, that such a remand is not appropriate where the record clearly shows that the country conditions material in the record will not serve to rebut the presumption. *Navas*, 217 F.3d at 661–62; *Maini*, 212 F.3d at 1177; *Vallecillo–Castillo*, 121 F.3d at 1240; *Prasad v. INS (G. Prasad )*, 101 F.3d 614, 617 (9th Cir.1996).

■ The evidence in this case compels the conclusion that conditions have not changed sufficiently to rebut the presumption that arose with respect to Chand. While the evidence in the record suggests that, in general, conditions had improved in Fiji between the time of the 1987 coup and the time described in the State Department's Profile, they obviously did not improve enough to save Chand from several attacks by Fijian soldiers and ethnic Fijians or from his eviction from his land and the seizure of his home. Most important, the Profile quoted above makes clear that racially motivated crime of the type Chand faced remains a problem for some Indians, and that in some cases police are unable or unwilling to stop such crime.

We recently denied a petition for review filed by an Indian Fijian on the ground that even if she had suffered persecution, country conditions had changed sufficiently

to rebut the presumption to which she may have been entitled. *See Kumar v. INS,* 204 F.3d 931, 934 (9th Cir.2000). *Kumar,* however, cannot be read to stand for a general proposition that no Indian Fijian can any longer have a reasonable fear of future persecution because conditions in Fiji had improved.

First, we have long held that the determination of whether or not a particular applicant's fear is rebutted by general country conditions information requires an individualized analysis that focuses on the specific harm suffered and the relationship to it of the particular information contained in the relevant country reports. As we stated in *Garrovillas v. INS,* 156 F.3d 1010, 1017 (9th Cir.1998), "our cases hold that 'individualized analysis' of how changed conditions will affect the specific petitioner's situation is required. Information about general changes in the country is not sufficient." *Id.* (citing *Osorio v. INS,* 99 F.3d 928, 933 (9th Cir.1996); *Berroteran–Melendez v. INS,* 955 F.2d 1251, 1257 (9th Cir.1992) (stating that "blindly" applying country conditions information to deny claims would be error)).

The reason for the requirement of individualized analysis is clearly demonstrated by the differences between *Kumar* and the case before us. Whereas in that case the petitioner suffered no harm beyond that which "took place in the aftermath of the 1987 coups," *Kumar,* 204 F.3d at 934, here Chand suffered harm at the hands of the Fijian military and other Fijians that the government would not control in 1988, 1990, 1991, 1992, and immediately before he left in early 1993. Thus, regardless of what may or may not be true as a general proposition, the record before us clearly does not support the conclusion that the presumption with respect to the persecution Chand suffered has been rebutted because, "since [the coups], conditions have improved significantly in Fiji, and any lingering discrimination that may exist against Indo–Fijians certainly does not rise to the level of persecution." *Kumar,*

204 F.3d at 934. On the contrary, Chand suffered several incidents of persecution well after the coup, and the record contains substantial corroborating evidence, both in the form of articles from Fiji and in the State Department's Profile, that racially motivated crime in Fiji remains a problem for many individuals, and that in some cases the police are unable or unwilling to control that crime.

It is not surprising that while racial or religious conditions may have improved generally, a number of individuals may continue to be subjected to acts of persecution on a regular basis. It may be true that in some regions of the country conditions are better than in others, or even that there are some villages in which persecution reigns and others in which it is entirely absent. Conditions may also differ depending on the social class or the political views of particular Indians. The State Department's Profile itself states that Indians are "sometimes" subject to harassment and that police are "sometimes" unable or unwilling to control it. Because Chand has shown that he has continued to face significant problems in the years after the coup, even after the general conditions improved substantially, any reasonable fact-finder would be compelled to conclude that the country conditions information in the record is not sufficient to rebut the presumption of future persecution in this case. Thus, there is no basis for a remand on the country conditions question.

## VII.

For the foregoing reasons, we hold that Chand is eligible for asylum and remand for the Attorney General to exercise her discretion with respect to such relief. With respect to withholding of deportation, Chand must meet a higher burden. To qualify for withholding, Chand must "demonstrate that it is more likely than not that [he] would be subject to persecution in the country to which he would be returned." *I.N.S. v. Cardoza–*

*Fonseca,* 480 U.S. 421, 423, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (citation omitted). The reasons that compel our holding that Chand is eligible for asylum would also compel any reasonable fact-finder to conclude that Chand is entitled to withholding of deportation. We therefore hold that Chand has demonstrated his entitlement to withholding of deportation as well as his eligibility for asylum.

We GRANT Chand's petition for review and REMAND his case to the BIA for further action consistent with this opinion.