293 F.3d 61
 GUAN SHAN LIAO, a/k/a Guang Shan Liao; a/k/a Guang Zee Liu, Petitioner,
v.
UNITED STATES DEPARTMENT OF JUSTICE, Attorney General Reno, United States Department of Justice, Executive Office of Immigration Review, Board of Immigration Appeals, United States Department of Justice, Executive Office of Immigration Review, Office of the Immigration
Judges, United States Department of Justice, Immigration and Naturalization Service, Commissioner Meisner & United States Department of Justice, District Director McElroy, Respondents.
 Docket No. 00-4046.
 United States Court of Appeals, Second Circuit.
 Argued: October 19, 2001.
 Decided: June 20, 2002.
 
 COPYRIGHT MATERIAL OMITTED Bruno J. Bembi, Hempstead, New York, for Petitioner.
 Edward Chang, Assistant United States Attorney, New York, New York (Mary Jo White, United States Attorney, Meredith E. Kotler, Kathy S. Marks, Sara L. Shudofsky, Assistant United States Attorneys, Southern District of New York, New York, New York, of counsel), for Respondents.
 Before OAKES, CARDAMONE, and JACOBS, Circuit Judges.
 Judge JACOBS concurs in a separate opinion.
 CARDAMONE, Circuit Judge:
 
 
 1
 Guan Shan Liao (Liao, petitioner, or applicant), a native of the People's Republic of China (China), seeks asylum in this country on the basis of his resisting China's family control policy. Liao argues that he is entitled to such relief because he suffered past persecution and has a well-founded fear of future persecution as a result of his resistance to China's "one child" population control program. At the hearing, Liao testified and submitted documentary evidence in support of his application for asylum and withholding of exclusion. After the immigration judge denied relief, petitioner appealed to the Board of Immigration Appeals (Board, Appeals Board, or Board of Appeals).
 
 
 2
 In denying the appeal, the Board gave only cursory and somewhat ambiguous explanations for the conclusions it reached. Such practice makes our review most difficult because, as this appeal illustrates, it leaves us in doubt as to whether, in denying the petition, the Board's methodology conformed to the applicable statutory and regulatory law. Because we believe the Appeals Board ultimately did apply the correct legal framework, however inartfully stated, we affirm. But the ambiguities in its opinion call for a full exposition of the issues in this case. Accordingly, we write to clarify the analysis the Appeals Board applied so that the ambiguities in its opinion are not carried into future cases, and so that the right to obtain asylum is not thereby unnecessarily clouded.
 
 BACKGROUND
 
 3
 On October 5, 1991 Liao flew into the United States and attempted to gain illegal entry by sneaking out of the immigration inspection area of the Los Angeles International Airport. After being apprehended, Liao filed an application for asylum and withholding of exclusion alleging that if he were returned to China, he would be arrested for "[h]aving more than 2 children." In November 1991 Liao posted a $2500 bond and was released from the custody of the Immigration and Naturalization Service (INS). Subsequently, petitioner failed to appear at his exclusion hearing in February 1992 and was ordered to be excluded in absentia. Petitioner filed a second asylum application in May 1992. In June 1992 he moved to have his exclusion proceedings reopened and for a change of venue to New York. One month later these motions were granted, and a new exclusion proceeding commenced in New York on August 16, 1993.
 
 
 4
 In his second application, which contradicted his first to some extent, Liao claimed: (1) his father had been persecuted in the 1950s for anti-communist beliefs; (2) he had been fined when his son married at too early an age; (3) his house had been taken from him by the Chinese authorities; and (4) he and his family were forced to live on the run after the authorities discovered he had harbored a cousin who was wanted for sterilization.
 
 
 5
 In his testimony before the immigration judge, petitioner supplemented his application with additional facts. Most importantly, he testified that he was fined a second time for harboring his cousin, and submitted a copy of a notice ordering him to attend a birth control study class. He further alleged that had he attended this study class, he would have been detained until his cousin submitted to sterilization. Since the cousin has not yet been sterilized, Liao alleges that his family still living in China, including his wife, are actively evading the authorities.
 
 
 6
 In addition to the testimony elicited at the hearing, the immigration judge received evidence concerning China's family planning policies, particularly those in the Wenzhou area of the Zhejiang province where petitioner lived. To support his claims of persecution, Liao entered two New York Times articles into the record. These report that homes in many different provinces are routinely knocked down for birth control violations, and that an increasingly high proportion of couples are sterilized or use contraception. A State Department report providing a detailed account of birth control policies in the Zhejiang province also became part of the record.
 
 PROCEDURAL HISTORY
 
 7
 In an oral decision rendered at the conclusion of the hearing, the immigration judge rejected Liao's application. The decision began by noting that to obtain asylum or withholding of deportation, an applicant must show a persecutive motive on the part of the foreign government based on any one of five statutorily-enumerated grounds, including race, religion, nationality, membership in a particular social group, or political opinion. Under In re Chang, 20 I. & N. Dec. 38 (BIA May 12, 1989), the controlling precedent at the time of the immigration judge's decision, applicants who had been subjected to or punished for resisting China's population control policy were not assumed to have been persecuted on a protected ground. Given this rule, the immigration judge found that petitioner's evidence — all of which was related to the population control program — fell squarely within the ruling of In re Chang. Additionally, in holding that petitioner's proof did not evince a persecutive motive on one of the five protected grounds, the immigration judge characterized Liao's allegations concerning the study class as "hyperbole."
 
 
 8
 On January 31, 2000, more than six years later, and after a de novo review of the record, the Appeals Board ruled on petitioner's appeal from the immigration judge's opinion. When this review occurred, Congress had overruled In re Chang by amending the definition of the term "refugee." Illegal Immigration Reform and Immigration Responsibility Act of 1996, Pub.L. No. 104-208, § 601(a), Div. C., 110 Stat. 3009-546, 3009-689 (codified at 8 U.S.C. § 1101(a)(42) (2000)) (IIRIRA). The Board nevertheless found that Liao still did not qualify for refugee status, since none of his conduct constituted "such resistance" to the government's family planning policies as would subject him to persecution upon his return to China. With respect to the applicant's evidence regarding the study course, the Board found that absent corroborating evidence to bolster his claims, Liao could not show he had a well-founded fear of persecution. The Board concluded by stating, "We find that the evidence of record, considered cumulatively, does not show that the applicant has met his burden of demonstrating that he has suffered past persecution or has a well-founded fear of persecution on account of one of the five grounds for which asylum may be granted." It is from this decision and order that petitioner appeals.
 
 DISCUSSION
 I Standard of Review
 
 9
 Liao petitions us to review the decision pursuant to § 309(c)(4) of the IIRIRA. In conducting this review, we apply the substantial evidence test to the Board's factual findings and reverse only if no reasonable factfinder could have arrived at the same conclusion. Diallo v. INS, 232 F.3d 279, 287 (2d Cir.2000). Similarly, we defer to the Board's interpretation of the statutory law it administers, Osorio v. INS, 18 F.3d 1017, 1022 (2d Cir.1994), reversing only when its interpretations are unreasonable. Id.
 
 
 10
 When the INS has promulgated a regulation "to protect a fundamental right derived from the Constitution or a federal statute" for an alien's benefit, we require the administrative tribunal to adhere to it. Waldron v. INS, 17 F.3d 511, 518 (2d Cir.1994). If review centers on the Board's application of legal principles to undisputed facts, we review the determination reached — in this case denying asylum and withholding of deportation — de novo. Alvarado-Carillo v. INS, 251 F.3d 44, 49 (2d Cir.2001).
 
 
 11
 Liao contends the Board erred by holding he was not eligible for either political asylum or withholding of exclusion, the two alternative forms of relief for deportable aliens who claim they were or will be the subject of persecution in their home country. See Melgar de Torres v. Reno, 191 F.3d 307, 311-12 (2d Cir.1999). Since the standard for evaluating applications for withholding of deportation is similar to — but more stringent than — the standard for asylum claims, an applicant must show eligibility for asylum before withholding of deportation need be considered. See Zhang v. Slattery, 55 F.3d 732, 738 (2d Cir.1995) ("An applicant who has failed to satisfy the requirements for asylum has necessarily failed to satisfy the requirements for withholding of return."). For this reason, we focus our analysis on petitioner's asylum claim.
 
 II Standards for Seeking Asylum
 
 12
 To obtain asylum, an applicant must initially establish that he is a refugee, or a person who is unable to return to his native country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). When Congress amended the definition in 1996, it added the following clarifying language
 
 
 13
 [1] [A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and
 
 
 14
 [2] a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.
 
 
 15
 IIRIRA § 601(a).
 
 
 16
 From § 1101(a)(42) it may be seen that an applicant can obtain refugee status by demonstrating past persecution or a well-founded fear of persecution. For either method the applicant must satisfy two elements. To satisfy the first element the applicant must show persecution — either that the applicant suffered persecution in the past or has a well-founded fear that he will be subjected to persecution upon return to his country of origin. See Osorio, 18 F.3d at 1031. To satisfy the second element the applicant must demonstrate that the basis of the persecution is a ground protected by Congress which, as noted, includes race, religion, nationality, membership in a social group, or political opinion. See id. at 1029-31. Importantly, if the applicant fits into the amended definition of refugee because he suffered persecution or has a well-founded fear of persecution for resisting a coercive population control program, he is then entitled to the benefit of a conclusive presumption that he has satisfied the second element, i.e., his persecution occurred on account of a protected ground.
 
 
 17
 As just observed, an applicant can establish refugee status by demonstrating he suffered past persecution in his country of origin on the basis of a protected ground. Various types of conduct constitute persecution, such as, for example, the deliberate imposition of a substantial economic disadvantage. See Chen v. U.S. INS, 195 F.3d 198, 204 (4th Cir.1999). If the applicant meets the requirements of demonstrating past persecution under this approach, then a rebuttable presumption arises establishing that the applicant has a well-founded fear of persecution. 8 C.F.R. § 208.13(b)(1) (2000). This presumption may be rebutted if a preponderance of the evidence establishes that a change in circumstances in the applicant's country of nationality has occurred such that the applicant's fear is no longer well-founded. Id. § 208.13(b)(1)(i). Nevertheless, even if the presumption is rebutted, the applicant might still be eligible for a grant of asylum, but only if he can show "compelling reasons." Id. § 208.13(b)(1)(ii).
 
 
 18
 Alternatively, an applicant may qualify for asylum by demonstrating a well-founded fear of being persecuted on a protected basis. Under this standard, the applicant must prove that he has a genuine fear and that a reasonable person in the applicant's position would share that fear. See Melgar de Torres, 191 F.3d at 311. Thus, there is a subjective and an objective component to a well-founded fear. The subjective component "may be based on the applicant's reaction to events that impinge on him personally; but to make it a well-founded fear, there must be other proof or objective facts that lend support to the applicant's subjective fear." Melendez v. U.S. Dep't of Justice, 926 F.2d 211, 215 (2d Cir.1991). Importantly, to show that a reasonable person would share a certain fear, asylum applicants need not prove "it is more likely than not that they will be persecuted if deported." INS v. Cardoza-Fonseca, 480 U.S. 421, 450, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). If an applicant is able to establish that he is entitled to refugee status, the Attorney General may, in his discretion, grant asylum. See Alvarado-Carillo, 251 F.3d at 50.
 
 III Board's Analysis
 
 19
 Although Liao submitted evidence to show past persecution and his fear of future persecution upon return to China, the Board gave detailed attention only to that evidence relating to his fear of persecution through the birth control study class. The remaining evidence was summarily dismissed using the conclusory language quoted earlier in this opinion. When the Board decides a case, as here, using summary language with little explanation for the conclusion reached, intelligible appellate review is made difficult. See Zhao v. U.S. Dep't of Justice, 265 F.3d 83, 93 (2d Cir.2001) ("An abuse of discretion may be found in those circumstances where the Board's decision provides no rational explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements.").
 
 
 20
 Despite our misgivings, the Board's underlying opinion contains sufficient rationale for the results reached for us, giving it the benefit of the doubt, to hold that it employed the correct analysis on Liao's refugee application. Unlike in Anderson v. McElroy, 953 F.2d 803, 806 (2d Cir. 1992), where we reversed a Board decision because the agency failed to consider the entire record, we have greater assurances in the instant case that the totality of Liao's evidence was considered. The Board not only based its findings on "the evidence of record, considered cumulatively," but also described each piece of evidence at the outset of its analysis. Additionally, as our subsequent analysis will demonstrate, whatever evidence the Board failed to analyze in detail was for the most part insignificant. See Douglas v. INS, 28 F.3d 241, 244 (2d Cir.1994) ("[T]he BIA merely failed to mention explicitly what is by any standard very marginal evidence.... This testimony might reasonably have been omitted in the BIA's decision as too insignificant to merit discussion."). To consider the merits of Liao's arguments, we begin with the Board's reasoning. Given the cursory nature of its opinion, such attention is warranted to avoid confusion in future cases.
 
 
 21
 The Board began its analysis by listing and summarily dismissing most of Liao's claims that involved allegations of past and future persecution. It stated
 
 
 22
 We find that the applicant has not established that he falls within the new definition of refugee on the basis of his having been fined because his son applied for a marriage license while underage and for harboring his cousin who had fled from birth control officials believing that he might be sterilized, having his house sealed after the family had left, and having been ordered to report for a study class on birth control policies. The applicant has not shown that these actions constitute "such resistance" to the government's family planning policies that he would be subject to persecution upon his return to China.
 
 
 23
 By dismissing Liao's claims using the above language, the Board impliedly defined resistance in such a way that an asylum applicant would be required to show that he "would be subject to persecution upon his return to China." Whether one views Liao's arguments as pertaining to past or future persecution, the Board's opinion cannot be read as endorsing this definition. To show past persecution, an applicant need only show that he was subjected to certain types of persecutorial government action; therefore, the use of the future tense, "would be ... upon his return," is incompatible with a claim based solely on the past. This is illustrated by the fact that if the applicant shows that he was subjected to persecution, it then becomes the government's burden to prove the applicant does not have a well-founded fear that he would be persecuted upon his return to his country of origin.
 
 
 24
 For this reason, if an applicant has to show that his resistance would subject him to persecution to qualify as a refugee under the amended definition, then the entire burden-shifting framework established under the regulations, 8 C.F.R. § 208.13(b)(1)(i), for claims of past persecution would be undermined by the word resistance. If it was the Board's intention to define resistance in this way, then this interpretation of the statutory language would plainly conflict with the rest of the asylum framework and, as such, would be an unreasonable interpretation of Congress' mandate. See Cardoza-Fonseca, 480 U.S. at 446-48, 107 S.Ct. 1207.
 
 
 25
 Although one could interpret the above-quoted portion of the Board's opinion as applying to Liao's claims of past persecution, such as economic persecution in the destruction of his house, we believe the best interpretation of this ambiguous language is that the Board intended this section to address the well-founded fear framework. Even if this were the case, however, the use of the words "would be," without qualification, created an ambiguity in the Board's rationale. Typically, this terminology is associated with the higher burden of proof that attaches to applications for withholding of deportation. See Diallo, 232 F.3d at 284. This is because an individual can have a subjectively and objectively well-founded fear of persecution even if it is improbable that he will be persecuted upon his return to his own country. See Cardoza-Fonseca, 480 U.S. at 431, 107 S.Ct. 1207.
 
 
 26
 As noted by the Supreme Court, depending upon the type and severity of the government persecution, "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." Id. The question is not therefore simply whether the applicant "would be" subjected to persecution upon his return, but rather whether he has a genuine and reasonable fear that he would be. Despite the Board's inartful language, we read these two sentences of the opinion as simply faulting the applicant for failing to show that any of these actions would even potentially subject Liao to persecution upon his return to China. Given the overall brevity of the opinion and the lack of discussion of this particular issue, it seems highly unlikely that the Board intended for these two sentences to establish a farreaching definition of resistance. This conclusion comports with our belief that petitioner did not establish even a colorable claim of qualifying for refugee status, a subject we deal with next.
 
 IV Liao's Evidence of Past Persecution
 
 27
 Petitioner sets forth three different bases upon which he believes a claim of past persecution can rest: (1) he was fined excessively; (2) he was threatened with detention, forced to leave his village, and deprived of valuable government services; and (3) his house was destroyed or sealed. We consider each of his arguments.
 
 
 28
 First, petitioner's assertion that excessive fines were imposed on him seems to be a claim of economic persecution, see Chand v. INS, 222 F.3d 1066, 1074 (9th Cir.2000) ("Economic persecution has been credited as an important part of asylum claims on numerous occasions."); Alvarado-Carillo, 251 F.3d at 48, 55-56 (remanding case to the Board to reconsider, inter alia, claim of severe economic persecution as a result of blacklisting). Because the applicant's counsel made no effort to set out or apply the relevant legal standards for such a claim, we would in the usual case consider the issue waived. See Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir.1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."). But for purposes of completeness on this appeal we address the merits of the petitioner's economic persecution argument.
 
 
 29
 While we recognize that economic deprivation may constitute persecution, an asylum applicant must offer some proof that he suffered a "deliberate imposition of substantial economic disadvantage." Chen, 195 F.3d at 204; see also Chand, 222 F.3d at 1074. Reviewing this record, we find no proof that would permit such a determination. No testimony or other evidence was presented regarding petitioner's income in China, his net worth at the time of the fines, or any other facts that would make it possible for us to evaluate his personal financial circumstances in relation to the fines. Absent this sort of proof, we cannot assess whether or not the fines constituted a substantial disadvantage to him. It is unfortunate that such basic and relevant testimony to a claim of economic persecution was not elicited from petitioner. In any event, the problem created by this evidentiary gap is compounded by the government's State Department report that indicates that "most families" in Liao's "relatively prosperous" home area "do not find the fines and fee[s] [for birth control violations] unduly heavy." Since this report tends to contradict the basis for his assertion and we have no other probative evidence, the fines Liao allegedly paid may not be said on this record to constitute economic persecution.
 
 
 30
 Next, the applicant maintains he was threatened with detention, forced to leave his village, and deprived of valuable government services. With regard to the threat of detention, the threat itself — an ambiguously worded order to attend a birth control study class — is not past persecution. Because this threat also pertains to whether Liao established a wellfounded fear of persecution, we discuss the study class order more extensively in a moment. With respect to the forced exit from his village and deprivation of government services, the record is far too sparse to support a claim of past persecution. For example, Liao testified he left his home because his neighbor informed him that "two persons from the community" were looking for him. Yet, he did not indicate who these persons were or what they would have done had they found him and his family. Thus, this claim is conjectural. See Aguilar-Solis v. INS, 168 F.3d 565, 573 (1st Cir.1999) (finding "vague threats" relayed by family and friends to be insufficient to support asylum application).
 
 
 31
 Petitioner also declares in his brief that after his family left the house, it was destroyed. But, in his asylum application he indicated the house was instead sealed with all of his possessions confiscated, and at his hearing he testified that nothing happened to the house because no one lived there. These inconsistencies in the proof do not provide a basis for a finding of economic persecution. More importantly, even assuming Liao's house was damaged, we do not know that this loss was attributable to the government because he only vaguely identified the two persons he believes were looking for him and whom he blames for having to vacate his home. Thus, petitioner's proof fails to establish his past persecution.
 
 
 32
 V Liao's Evidence of a Well-Founded Fear of Persecution
 
 
 33
 Liao makes two contentions to establish his well-founded fear of persecution: (1) that he or his wife fear sterilization; and (2) that he fears detention in the form of the birth control study class.
 
 
 34
 In a conclusory fashion, the applicant asserts on appeal that his "testimony and written evidence, along with the State Department reports and newspaper articles, establish that [he] has a well-founded fear that he or his wife could face sterilization." As an initial matter, petitioner's somewhat problematic testimony suggests he was concerned about his cousin being sterilized, not his wife or himself. Second, in making this argument, Liao does not refer to the only relevant background evidence concerning the birth control policy in his home province, that is to say, the State Department report. That report indicates the birth control policy in the Wenzhou area is ineffective and does not involve force. Third, and most tellingly, Liao does not explain why his wife, who is 51 years old and had her children in the early 1970s, would be a potential target for sterilization. In light of the above, no basis exists to believe the applicant has a wellfounded fear that either he or his wife will be sterilized.
 
 
 35
 Turning now to the threat of detention, Liao urges that this threat — in the form of the order to attend the study class — also furnishes a basis for a well-founded fear of persecution. In reviewing this argument, the Board of Appeals observed that the only evidence Liao offered regarding the nature of the study class was his own testimony. The Board found this insufficient without any objective, corroborating proof to support it. Importantly, the Board rejected petitioner's testimony, even though it found "no basis in the record for finding [Liao] to be not credible." Since the Board of Appeals only engaged in a superficial discussion of this topic, we must look to the standard concerning when corroborating evidence of an applicant's testimony is needed.
 
 
 36
 To begin, INS regulations state that, in appropriate circumstances, an applicant's testimony, "if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a) (emphasis added); accord Diallo, 232 F.3d at 286. In determining whether an applicant needs corroborating proof, the Board will evaluate whether the alien's testimony is "believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis of the alien's alleged fear." In re M-D-, 21 I. & N. Dec. 1180, 1998 WL 127881, at *6 (BIA Mar. 13, 1998), 1998 BIA LEXIS 5; see Diallo, 232 F.3d at 285 (citing In re M-D- with approval). Further, in evaluating whether an applicant's testimony meets this test, the Board of Appeals has carefully emphasized the importance of providing background evidence concerning general country conditions as a foundation for the applicant's claim. When available, this type of general information allows the trier of fact "to determine if an alien's claim is ... plausible." In re S-M-J-, 21 I. & N. Dec. 722, 724 (BIA Jan. 31, 1997). The Board additionally requires — when it is "reasonable" to do so — corroborating evidence of an applicant's personal experiences pertaining to "material facts which are central to [the applicant's] claim and easily subject to verification." Id. at 725. If an applicant fails to provide such evidence, "an explanation should be given." Id.
 
 
 37
 Reviewing Liao's testimony in this context, it fails to establish an adequate foundation. While petitioner did refer to general background information in the record, the evidence he cites provides no support for his contention and in some respects actually undermines it. For example, the portions of the State Department report dealing specifically with petitioner's home area tend to support the government's position. As a result, Liao discusses only the more generalized findings. He points out that the State Department found "credible reports of forced abortions and sterilizations." Upon examination, it becomes evident that the quoted language refers to the entire period since the one child policy has been in effect, going back to 1979; and, additionally, the discussion covers all of the "vast and varied" areas of China. As such, it is only of debatable relevance to Liao's claim.
 
 
 38
 Petitioner also points out that the Zhejiang province has one of the "lowest rates of birth-per-woman in the country." Again, this provides no support to the applicant's position unless there is some proof that this birth rate was achieved through coercion, such as through forced sterilizations and detentions. Moreover, the next sentence in the State Department report, which Liao ignores, qualifies this finding, observing that the "Wenzhou area of that province has long been known as one with special characteristics." In fact, the family planning program in the Wenzhou area is reported to be particularly ineffective — families average between 1.7 to 2.4 children depending upon where they live. The report further states that the evidence "strongly" supports the Chinese government's position that the local officials in this area lack leverage over women and, therefore, they must not be using force. Accordingly, we cannot fault the Board of Appeals' conclusion that Liao did not establish a well-founded fear of persecution.
 
 VI Alleged Due Process Violation
 
 39
 The applicant next declares the Board of Appeals abused its discretion by making its decision based on a record that was created before the definition of refugee was amended. His position is that the Board's de novo review of the evidence in light of the new law was necessarily inadequate and, as a result, the Board should have remanded the case sua sponte to an immigration judge for another hearing. By failing to do so, in Liao's view, it "inexplicably departed from [its] established policy," abused its discretion, and violated his due process rights.
 
 
 40
 As petitioner suggests, the Board does have "limited discretionary powers under the [INS] regulations to reopen or reconsider cases sua sponte," which it exercises "in unique situations where it would serve the interest of justice." In re X-G-W-, Interim Dec. 3352, 1998 WL 378104, at *5 (BIA June 25, 1998), 1998 BIA LEXIS 18; see 8 C.F.R. § 3.2(a) (2002) ("The Board may at any time reopen or reconsider on its own motion any case in which it has rendered a decision."). We cannot on these facts, if at all, direct the Board of Appeals to invoke its discretionary sua sponte authority. See Valderrama-Fonseca v. INS, 116 F.3d 853, 857 (9th Cir.1997) (holding that Board of Appeals is not required to remand sua sponte when intervening law suggests alien may be eligible for discretionary relief).
 
 
 41
 The only instances we can find where the Board is inclined to exercise its sua sponte authority are in connection with untimely motions filed by a petitioner. For instance, in In re X-G-W, an asylum applicant's wife was forcibly sterilized, and, as a result, the Board determined that the immigration judge who originally considered the case would not have denied the applicant's request but for In re Chang. Since the 1996 amendment to the definition of refugee overruled In re Chang, the Board accepted an untimely motion to reopen the exclusion proceedings based upon its discretionary sua sponte authority. In re X-G-W-, 1998 WL 378104, at *2, 6-8, 1998 BIA LEXIS 18. It explained that the amendment was "so significant and its impact so unambiguous that [the Board] found it warranted a readjudication." In re G-D-, Interim Dec. 3418, 1999 WL 1072237, at *9 (BIA Nov. 23, 1999), 1999 BIA LEXIS 45 (explaining rationale of In re X-G-W-). It is of some significance that this extraordinary authority was not exercised without a formal request by the applicant. To obtain this relief, the Board explained, an applicant is required to file a motion properly setting forth evidence establishing eligibility under the amended definition of refugee. See In re X-G-W-, 1998 WL 378104, at *8-9, 1998 BIA LEXIS 18.
 
 
 42
 We think petitioner's contention that the Board of Appeals should have remanded his case for a hearing fails for several reasons. Although the definition of refugee was amended in 1996 and the Board did not issue its decision until January 31, 2000, Liao never filed a motion requesting the Board of Appeals to remand his case for a hearing to present additional evidence. Further, even though he had the right to do so, petitioner neither filed a motion to reopen his exclusion proceedings after the Board issued its decision, nor moved for reconsideration. See 8 C.F.R. § 3.2(b) & (c). In addition, in his briefing before this Court, Liao did not set out specific facts that could be proved at a hearing and which, if proved, would change the result. Instead, he simply alleges that such facts exist. Finally, the Board of Appeals considered the evidence petitioner did present in light of the new law and found it inadequate. Given these considerations, no ground exists to find a due process violation.
 
 
 43
 We have carefully reviewed all of Liao's remaining arguments and find none of them to be of merit.
 
 CONCLUSION
 
 44
 Accordingly, for the reasons stated, the petition for review is denied and the order of the Board of Appeals is affirmed.
 
 
 45
 JACOBS, Circuit Judge, concurring.
 
 
 46
 I agree with the result reached in the majority opinion, as well as with the analysis adopted to arrive at that result. I concur separately because I do not subscribe to the majority's critique of the opinion issued by the Board of Immigration Appeals ("BIA").
 
 
 47
 I think we can assume, based upon the numerous opinions issued by the BIA on this subject, that the BIA understands the principle, set forth in the agency's own regulations, that is determinative in this case: for the purpose of obtaining refugee status, "persecution" is demonstrated by showing either past "persecution or a wellfounded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42) (emphasis added).
 
 
 48
 The majority opinion reads the BIA's analysis as bearing upon the threat of future prosecution without giving distinct consideration to whether petitioner was subjected to persecution in the past. The BIA opinion summarizes as follows the history of past persecution claimed by petitioner, and recounts instances of harassment or annoyance that do not rise to persecution:
 
 
 49
 We find that the applicant has not established that he falls within the new definition of refugee on the basis of his having been fined because his son applied for a marriage license while underage and for harboring his cousin who had fled from birth control officials believing that he might be sterilized, having his house sealed after the family had left, and having been ordered to report for a study class on birth control policies.
 
 
 50
 That said, and without beginning a new paragraph that would better reflect a new prong of the analysis, the BIA added:
 
 
 51
 The applicant has not shown that these actions constitute `such resistance' to the government's family planning policies that he would be subject to persecution upon his return to China.
 
 
 52
 According to the majority, this last sentence raises an ambiguity because the BIA "impliedly defined resistance in such a way that an asylum applicant would be required to show that he `would be subject to persecution upon his return to China,'" Maj. Op. at 68 whereas under current law, an applicant alternatively can show that he was subjected to persecution in the past.
 
 
 53
 In my view, it is evident from the BIA's findings that the BIA reviewed the issues of past persecution, and discounted them:
 
 
 54
 [Petitioner] has not established [that he was a] refugee on the basis of his having been fined ..., harboring his cousin..., having his house sealed ..., and having been ordered to report for a study class ....
 
 
 55
 (Emphasis added.) The penultimate sentence of the BIA's decision brings into focus any blurring of the distinction between past persecution and the danger of persecution in the future:
 
 
 56
 We find that the evidence of record, considered cumulatively, does not show that the applicant has met his burden of demonstrating that he has suffered past persecution or has a well-founded fear of persecutionon account of one of the five grounds for which asylum may be granted.
 
 
 57
 (Emphasis added.)
 
 
 58
 Like many opinions of many courts, the text of the BIA's opinion in this case is sub-optimal. A grammarian would recommend that the first and second sentences block-quoted above be separate paragraphs, or that the second sentence begin with a transitional word or phrase. But it is plain enough to me that the BIA considered and deemed insufficient the claim of past persecution (as does every member of this panel), on the basis of the same circumstances that render insufficient the claim of future persecution.