Jocelyn Agonoy **NAKAMOTO,** Petitioner,

v.

John **ASHCROFT,** Attorney General, Respondent.

**No. 03–70421.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 3, 2003.

Filed April 1, 2004.

Scott T. Strack, Honolulu, HI, for the petitioner.

Anthony C. Payne, United States Department of Justice, Office of Immigration Litigation, Washington, D.C., for the respondent.

Before: PAEZ, BERZON, and BEA, Circuit Judges.

PAEZ, Circuit Judge:

Petitioner Jocelyn Agonoy Nakamoto ("Nakamoto"), a native and citizen of the Philippines, married Jeremias Del Rosario ("Del Rosario"), a United States citizen, on December 18, 1992. Nakamoto obtained an immediate relative status visa on the basis of her marriage to Del Rosario and was admitted to the United States on March 27, 1995. After the Hawaii Family Court for the Third Circuit ("Hawaii family court") annulled Nakamoto's marriage to Del Rosario, the Immigration and Naturalization Service ("INS") [1] charged Nakamoto under § 237(a)(1)(G)(ii) of the Immigration and Nationality Act ("INA") for fraudulently entering into her marriage for purposes of evading the United States' immigration laws. 8 U.S.C. § 1227(a)(1)(G)(ii) (2000). Subsequently, the INS placed Nakamoto in removal proceedings and an Immigration Judge ("IJ") ordered her removed to the Philippines on September 10, 1999. The Board of Immigration Appeals ("BIA") affirmed the IJ's ruling and Nakamoto filed a petition for review on January 27, 2003.

This case raises a preliminary question of whether we have jurisdiction to review the BIA's decision. We conclude that because the determination under § 1227(a)(1)(G)(ii) is not committed entirely to the Attorney General's discretion, we

---

1. In March 2003, the Department of Justice transferred the functions of the INS to the newly created Department of Homeland Security. See Homeland Security Act of 2002. Pub.L. No. 107–296 § 471, 116 Stat. 2135 (2002). Because Sung Hee filed her petition for review prior to 2003, we refer to the INS, rather than to the Department of Homeland Security.

have jurisdiction to review the BIA's decision in this case. We further conclude that the BIA's decision was supported by substantial evidence and therefore deny Nakamoto's petition for review.

## I.

### A.

Jocelyn Nakamoto, a native and citizen of the Philippines, was twenty-two when she began corresponding with her future husband, Jeremias Del Rosario, a United States citizen and resident of Hawaii. The couple exchanged letters for nearly five years. These letters reveal that during this time, a long, and somewhat tumultuous, relationship developed between Nakamoto and Del Rosario. After several years of long-distance romance, Del Rosario proposed marriage and in December 1992, flew to the Philippines and married Nakamoto. Del Rosario stayed in the Philippines for four days after the marriage ceremony before returning to Hawaii.

After Del Rosario returned to Hawaii, the relationship between Nakamoto and her husband deteriorated substantially. Shortly after Del Rosario left, Nakamoto discovered that Del Rosario had a girlfriend in Hawaii. Nakamoto refused to go to Hawaii and, in a series of letters, pleaded for a divorce.

The couple did not dissolve their marriage, however, and Nakamoto continued to write to Del Rosario over the next two years. In March, 1995, Nakamoto agreed to join her husband in Hawaii. According to Nakamoto, Del Rosario met her at the airport and drove her straight to her aunt's house, explaining that he had only a studio, which he shared with his mother and which would not be large enough for the three of them. Del Rosario disputed this version of Nakamoto's arrival in Hawaii, claiming that he met Nakamoto at the airport but that she refused to return to his apartment with him. Del Rosario stayed the next two nights with Nakamoto in her aunt's house, but the couple did not live together after that.

Sometime in 1995, Nakamoto met and became friends with her current husband, Daryl Nakamoto, a United States citizen. The friendship eventually evolved into a romantic relationship and Nakamoto gave birth to their son on December 14, 1996. In 1997, Nakamoto brought suit to dissolve her marriage to Del Rosario and Del Rosario counterclaimed for an annulment of the marriage. On April 9, 1997, the Hawaii family court entered a decree of annulment on the basis that Nakamoto had fraudulently obtained Del Rosario's consent to the marriage.

Nakamoto and her present husband, Daryl, were married in June 1997. At the time of her removal hearing, the Nakamotos lived together in Hawaii with their son, Daryl, Jr., and Daryl Nakamoto's two parents.

### B.

On March 16, 1998, the Immigration and Naturalization Service ("INS") commenced removal proceedings against Nakamoto, alleging that, under INA § 237(a)(1)(G)(ii), 8 U.S.C. § 1227(a)(1)(G)(ii), Nakamoto had procured her visa by fraud. Nakamoto appeared before an IJ and sought relief from removal on the ground that she entered into her marriage with Del Rosario in good faith and not for the purpose of obtaining an immigration benefit. Nakamoto also sought a continuance of the hearing pending the adjudication of a visa petition filed by her second and current husband, Daryl Nakamoto. The IJ ultimately denied the continuance request and heard testimony regarding Nakamoto's eligibility for relief from removal on several dates between December 30, 1998 and September 10, 1999. During the course of

the proceedings, Nakamoto and the INS presented documentary evidence regarding Nakamoto's marriage and immigration status, including a 1997 judgment from the Hawaii family court annulling Nakamoto's marriage to Del Rosario, and letters from Nakamoto to Del Rosario sent during their courtship and after their marriage.

On September 10, 1999, the IJ determined that the INS had met its initial burden of proof and that the Hawaii family court's annulment order and the letters submitted as evidence "prove[d] that the marriage was a sham from the start."[2] The IJ also denied Nakamoto's request for voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c (2000).[3] Finally, the immigration judge denied Nakamoto's request for a continuance pending the resolution of her application for adjustment of status.

In denying Nakamoto relief from removal, the IJ concluded that even though Nakamoto had "exceptional and outstanding equities of family ties in the United States and a good work history" and that her removal would "cause terrible harm to [her] United States citizen son," "she could not show by a preponderance of the evidence that she did not enter into the marriage for purpose of evading immigration laws." The IJ reasoned that Nakamoto had not shown that she entered into her marriage to Del Rosario in good faith because "[t]here [was] little or no conduct before or after the marriage to show com-

mitment. The time they spent together is negligible and there are no joint assets."

On appeal to the BIA, Nakamoto argued that the IJ erred in finding that she was deportable and in denying her motion for a continuance. The BIA affirmed the IJ's ruling that Nakamoto entered into her marriage to Del Rosario only to secure immigration benefits and not for the purpose of establishing a life with him.

## II.

The INS raises an initial challenge to our jurisdiction to review the BIA's determination that Nakamoto is deportable pursuant to INA § 237(a)(1)(G)(ii), 8 U.S.C. § 1227(a)(1)(G)(ii). The question we must decide is whether we have jurisdiction to review the BIA's determination that Nakamoto entered into her marriage for the purpose of evading the United States' immigration laws.[4] For the reasons explained below, we hold that the determination of whether a petitioner committed marriage fraud is not a decision the authority for which is specified under the INA to be entirely discretionary. We conclude that 8 U.S.C. § 1252(a)(2)(B)(ii) does not limit our jurisdiction to review orders of removal entered under INA § 237(a)(1)(G)(ii), 8 U.S.C. § 1227(a)(1)(G)(ii), and therefore, we may properly review the BIA's determination of this issue.

2. The IJ also found that Nakamoto gave false testimony during her removal hearing. In her petition for review, Nakamoto argued that the IJ erred in finding that Nakamoto gave false testimony. We do not address this issue here because there is objective evidence in the record that we can look to in determining intent, and because Nakamoto's testimony, even if credible, would not, in light of the Hawaii family court's judgment of annulment, establish that the IJ's decision was not supported by substantial evidence.

3. In her petition for review, Nakamoto does not challenge the IJ's denial of voluntary departure.

4. We, of course, have jurisdiction "to determine whether jurisdiction exists." *Matsuk v. INS*, 247 F.3d 999, 1000–01 (9th Cir.2001) (citation and internal quotation marks omitted).

In 1996, Congress added § 1252(a)(2)(B)(ii) to Title 8 of the United States Code as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). *See* IIRIRA, Pub.L. No. 104–208 (Division C, § 306(a), 110 Stat. 3009–546, 3009–607 (1996)). This section replaces an affirmative grant of jurisdiction under former 8 U.S.C. § 1105a and restricted jurisdiction of federal courts to review certain INS decisions.

Section 1252(a)(2)(B) is not a general denial of jurisdiction. It does, however, limit our jurisdiction to review "(i) any judgment regarding the granting of relief under section 212(h) [8 U.S.C. § 1182(h) ], 212(i) [8 U.S.C. § 1182(i) ], 240A [8 U.S.C. § 1229b], 240B [8 U.S.C. § 1229c], or 245 [8 U.S.C. § 1255], or (ii) any other decision or action of the Attorney General the authority for which is specified under this subchapter to be in the discretion of the Attorney General, other than the granting of relief under section 208(a)[8 U.S.C. § 1158(a) ]." The Attorney General contends that, because the determination of whether an alien has committed marriage fraud is discretionary, we do not have jurisdiction under § 1252(a)(2)(B) to review Nakamoto's petition here.

The marriage fraud provision under which Nakamoto was charged provides:

An alien shall be considered to be deportable as having procured a visa or other documentation by fraud (within the meaning of section 212(a)(6)(C)(i)) and to be in the United States in violation of this Act ... if—

(ii) it appears to the satisfaction of the Attorney General that the alien has failed or refused to fulfill the alien's marital agreement which in the opinion of the Attorney General was made for the purpose of procuring the alien's admission as an immigrant.

8 U.S.C. § 1227(a)(1)(G). So, the question under 8 U.S.C. § 1252(a)(2)(B)(ii) is whether authority for a decision under § 1227(a)(1)(G) is "specified" to be in the Attorney General's discretion.

No court has yet decided this question. In evaluating whether a decision under § 237(a)(1)(G)(ii) is a decision the *authority* for which is *specified* under the INA to be within the Attorney General's discretion, it is not enough for the government to show that the decision is discretionary in nature. *See Spencer Enterprises, Inc. v. United States*, 345 F.3d 683, 690 (9th Cir.2003). Rather, it must show that "the authority for a particular act is in the discretion of the Attorney General, [that is], the right or power to act is *entirely* within his or her judgment or conscience." *Id.* (emphasis added). In other words, § 1252(a)(2)(B)(ii) precludes judicial review only of "matters of pure discretion, rather than discretion guided by legal standards." *Id.*

The INS argues that the text of INA § 237(a)(1)(G)(ii) places Nakamoto's removal solely within the discretion of the Attorney General. We disagree that the plain text of § 237(a)(1)(G)(ii) means that the authority for the Attorney General's decision is specified under this section to be entirely discretionary. Section 237(a)(1)(G) instructs that an alien "*shall be considered to be deportable*," 8 U.S.C. § 1227(a)(1)(G) (emphasis added), if "it appears to the satisfaction of the Attorney General," INA § 237(a)(1)(G)(ii), 8 U.S.C. § 1227(a)(1)(G)(ii), that the alien has failed or refused to fulfill his or her marital agreement and that, "in the opinion of the Attorney General," the agreement was made for the purpose of procuring the alien's admission to the United States as an immigrant. *Id.*

Section 237(a)(1)(G)(ii) employs the phrases "to the satisfaction of the Attorney

General" and "in the opinion of the Attorney General" to specify the identity of the decision-maker, indicating that it is the Attorney General who is authorized to determine the facts in the first instance. The text thus contemplates that, in determining whether an alien has committed marriage fraud, the Attorney General must make several key decisions—that is, the alien must convince the Attorney General that she entered into her marriage in good faith and not for the purpose of procuring her admission as an immigrant. But these are not the types of decisions over which § 1252(a)(2)(B)(ii) limits our jurisdiction. In *Spencer Enterprises, Inc.,* we repeatedly emphasized that § 1252(a)(2)(B)(ii) applies only to those types of decisions or acts for which the authority is specified to be entirely discretionary. 345 F.3d at 690.

■ It is noteworthy here that Nakamoto falls under the permanent, rather than the transitional, rules of the IIRIRA. As we explained in *Spencer Enterprises, Inc.,* the extent of the limits on our jurisdiction embodied in § 1252(a)(2)(B)(ii) differs significantly from the limitation on our jurisdiction in IIRIRA § 309(c)(4)(E), 110 Stat. at 3009–626, which governed the IIRIRA's transitional rules. *See Spencer Enterprises, Inc.,* 345 F.3d at 690–91. Whereas under the transitional rules, our jurisdiction was limited over any discretionary decision of the Attorney General, *see Kalaw v. INS,* 133 F.3d 1147, 1150–52 (9th Cir.1997), under § 1252(a)(2)(B)(ii), we lack jurisdiction only over those decisions that are "specified by statute to be entirely discretionary." *Spencer Enterprises, Inc.,* 345 F.3d at 690.

In *Spencer Enterprises, Inc.,* we examined the types of decisions which the Attorney General had the ultimate discretionary authority to make, by either granting or withholding relief. Among these decisions are those where the statu-

tory language clearly specifies that the particular decision is left to the *"sole* or *unreviewable* discretion of the Attorney General." *Id.,* 345 F.3d at 690 (emphasis in original) (citing IIRIRA § 301(b), 110 Stat. at 3009–577, 8 U.S.C. § 1182(a)(9)(B)(v)) (stating that the "Attorney General has sole discretion to waive" a requirement); *id.* (citing IIRIRA § 303(a), 110 Stat. at 3009–586, 8 U.S.C. § 1226(e)) ("The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review."); *id.* (citing IIRIRA § 304(a), 110 Stat. at 3009–594, 8 U.S.C. § 1229b(b)(2)(D)) (the determination of credibility and weight of evidence "shall be within the sole discretion of the Attorney General"). Because of this important distinction between the kinds of decisions covered by the relevant provisions of the permanent and transitional rules, *Kalaw's* conclusion that under the transitional rules, we lacked jurisdiction to review a decision that was committed to "the opinion of the Attorney General," *id.,* 133 F.3d at 1152 (discussing the "extreme hardship" requirement for suspension of deportation), does not resolve our inquiry. Rather, while the words "in the opinion of the Attorney General" may indicate that the Attorney General has some discretion—thereby precluding jurisdiction under the transitional rules, which apply to "any" discretionary decision—it does not establish that the decision is "entirely" discretionary, as the permanent rules require. *Spencer Enterprises,* 345 F.3d at 690.

■ Another type of decision by the Attorney General, the authority for which is specified by statute—albeit not explicitly—and which is considered to be entirely discretionary *is a decision where it is clear* that even if the alien satisfies the statutory requirements for a particular form of re-

lief, the Attorney General may still deny his or her application for relief. *See, e.g., Romero–Torres v. Ashcroft,* 327 F.3d 887, 892 (9th Cir.2003) (holding that the court lacked jurisdiction to review the BIA's determination that an alien failed to satisfy the "exceptional and extremely unusual hardship" requirement for cancellation of removal under INA § 240A(b)(1), 8 U.S.C. § 1229b(b)(1), because the ultimate determination depended on a value judgment of the Attorney General). We do, however, retain jurisdiction to review the Attorney General's decisions, where his or her exercise of discretion is guided by the application of legal standards to the facts in question. *See Spencer Enterprises, Inc.,* 345 F.3d at 690–91.

Whether an individual has "procured a visa or other documentation by fraud" within the meaning of § 237(a)(1)(G) involves a question of fact, determined through the application of traditional legal standards. The existence or nonexistence of fraud is a factual determination, readily resolved by the application of legal standards defining fraud to the facts in question. The Attorney General must undertake an objective inquiry and refrain from imposing his or her own subjective values on the interpretation of facts. *See Damon v. Ashcroft,* 360 F.3d 1084, 1088 (9th Cir. 2004); *see also Bark v. INS,* 511 F.2d 1200, 1201 (9th Cir.1975). In other words, the Attorney General *cannot* legally make a judgment solely according to the dictates of his or her conscience.

The fact that legal standards circumscribe this factual determination is supported by the text of the statute: the alleged fraud must be *"within the meaning of* section 212(a)(6)(C)(i) [8 U.S.C.

§ 1182(a)(6)(C)(i) ]." INA § 237(a)(1)(G); 8 U.S.C. § 1227(a)(1)(G) (emphasis added). Thus, the Attorney General must undertake an inquiry to ascertain the existence of fraud and his or her application of legal standards to the facts of the case is mandatory.

Applying § 1252(a)(2)(B)(ii) here, we conclude that the Attorney General's authority to remove an alien for marriage fraud is not specified by statute to be entirely discretionary. Instead, the authority is derived from § 237(a)(1)(G), which both mandates removal, *see* § 237(a)(1)(G) ("An alien shall be considered to be deportable . . . .") and requires a decidedly factual determination—the existence or non-existence of fraud—guided by legal standards. We therefore conclude that § 1252(a)(2)(B)(ii) does not limit our jurisdiction to review the BIA's determination that Nakamoto has committed marriage fraud.

### III.

■■■ Having concluded that we do have jurisdiction to review the BIA's determination that Nakamoto committed marriage fraud, we next consider whether substantial evidence supports the BIA's finding that Nakamoto is removable pursuant to INA § 237(a)(1)(G)(ii), 8 U.S.C. § 1227(a)(1)(G)(ii).[5] As noted, whether Nakamoto committed fraud is an intrinsically fact-specific question, which we review under the substantial evidence standard. *See Khodagholian v. Ashcroft,* 335 F.3d 1003, 1006 (9th Cir.2003) (citing *Chavez–Ramirez v. INS,* 792 F.2d 932, 934–35 (9th Cir.1986)). Under this deferential standard, we must affirm the IJ's ruling

---

5. In her petition for review, Nakamoto argues that the BIA violated her due process rights in failing to conduct an independent review of the record. The BIA decision, however, reflects that it did review the evidence in the record. Even if it did not, Nakamoto's argument would be foreclosed by our recent decision in *Falcon Carriche v. Ashcroft,* 350 F.3d 845, 850–51 (9th Cir.2003).

unless the evidence is so compelling that no reasonable fact finder could fail to find the facts were as Nakamoto alleged. *See id.* (citing *Singh v. Reno,* 113 F.3d 1512, 1514 (9th Cir.1997)). The underlying burden of proof, however, is on the INS to establish by "clear and convincing evidence" that Nakamoto's status has changed. INA § 240(c)(3)(A), 8 U.S.C. § 1229a(c)(3)(A). In sum, combining the substantial evidence standard with the burden of proof, we must determine whether substantial evidence supports a finding by clear and convincing evidence that Nakamoto committed marriage fraud. *See Khodagholian,* 335 F.3d at 1006.

In this case, the IJ found that the INS had met its burden to establish by clear and convincing evidence that Nakamoto was removable. We agree with the IJ that the INS presented evidence—the transcript and judgment from the Hawaii family court—sufficient to meet its burden of proof. The IJ then held that Nakamoto could not show that she had married Del Rosario in good faith and not for the purpose of evading the United States' immigration laws.

 In deciding whether Nakamoto entered into her marriage for the purpose of procuring her admission as an immigrant to the United States, the focus of our inquiry is whether Nakamoto and Del Rosario intended to establish a life together at the time they were married. *See Bark,* 511 F.2d at 1201 (9th Cir.1975). Although evidence that the parties separated after the marriage is relevant to ascertaining whether they intended to establish a life together at the time of marriage, evidence of separation cannot, by itself, support a finding that the marriage was not bona fide. *Id.* at 1202.

 In undertaking this inquiry, we examine the objective evidence that would support a finding that the couple entered into the marriage with an intent to estab-

lish a life together—including evidence of whether Nakamoto was listed on Del Rosario's insurance policies, property leases, income tax forms or bank accounts; testimony or other evidence regarding their courtship, wedding ceremony; and evidence concerning whether they shared a residence. *See Matter of Laureano,* 19 I. & N. Dec. 1, 3, 1983 WL 29913 (BIA 1983); *see also* 8 C.F.R. § 1216.5(e)(2)(i)-(iv). Here, although the record contains some evidence that Nakamoto and Del Rosario intended to establish a life together at the time of their marriage, the INS presented significant evidence that she entered into the marriage for the purpose of evading the immigration laws.

Nakamoto and Del Rosario had corresponded for over three years before they were married. Although Nakamoto and Del Rosario spent less than a week in the same place together, Nakamoto's letters, both before and after her marriage, reveal that the couple had an involved emotional relationship spanning several years. Del Rosario provided financial support to Nakamoto and her family while Nakamoto lived in the Philippines. Moreover, Nakamoto waited nearly three years after her marriage to Del Rosario to join him in Hawaii, which supports Nakamoto's claim that she did not marry only for the purpose of immigrating to the United States.

Other significant evidence in the record, however, suggests that Nakamoto married Del Rosario for immigration purposes, and that the marital agreement was not fulfilled. Nakamoto revealed in letters and in state court testimony that she never really loved Del Rosario, and that she married him because her parents and relatives wanted her to move to the United States. Similarly, Del Rosario testified before the IJ that Nakamoto and her family wanted him to marry Nakamoto to bring her to Hawaii. In addition, once Nakamoto came

to the United States, she and Del Rosario resided in separate locations after spending two nights together at the outset.

 We need not, however, conduct an extensive inquiry into the parties' conduct before and after the marriage. Nakamoto faces a far more daunting hurdle in showing that she married Del Rosario in good faith: the Hawaii family court's judgment of annulment. The annulment itself is not dispositive of the question whether Nakamoto married to procure her admission as an immigrant. But this was not a simple dissolution of the marriage; the Hawaii annulment decree voided the Nakamoto–Del Rosario marriage on the ground that Del Rosario's consent to the marriage had been obtained by fraud. *See* Haw.Rev. Stat. § 580–21(5) (2003). The Hawaii family court concluded that Nakamoto made misrepresentations with the intent to induce Del Rosario to marry her and that Del Rosario relied on Nakamoto's representations to his detriment. The final judgment of the Hawaii family court is entitled to full faith and credit. *See Noel v. Hall,* 341 F.3d 1148, 1160 (9th Cir.2003); *see also* 28 U.S.C. § 1738. Taking into account this order of annulment on the ground of fraud, and other evidence in the record, we cannot say a reasonable adjudicator would be compelled to find that the facts supported a finding that Nakamoto fulfilled her marital agreement and that her marriage was not entered into for the purpose of procuring her admission as an immigrant.[6]

We therefore conclude that the BIA's decision is supported by substantial evidence. Accordingly, the BIA did not err

in determining that Nakamoto is removable under § 237(a)(1)(G)(ii), 8 U.S.C. § 1227(a)(1)(G)(ii).

PETITION DENIED.

---

**6.** Nakamoto also challenges the IJ's denial of her motion for a continuance pending her application for adjustment of status. We review the IJ's denial of a motion for continuance for abuse of discretion. *See Baires v. INS,* 856 F.2d 89, 91 (9th Cir.1988). In light of our holding that Nakamoto is removable under § 237(a)(1)(G)(ii), 8 U.S.C.

§ 1227(a)(1)(G)(ii), Nakamoto is not eligible for an adjustment of status. *See* INA § 204(c), 8 U.S.C. § 1154(c). Accordingly, we do not address the merits of Nakamoto's argument that the IJ abused her discretion in denying Nakamoto's motion for a continuance.