# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARTUR KARAPETYAN,
                           *Petitioner,*

v.

MICHAEL B. MUKASEY, Attorney
General,
                           *Respondent.*

No. 05-75865

Agency No.
A95-179-012

ARTUR KARAPETYAN,
                           *Petitioner,*

v.

MICHAEL B. MUKASEY, Attorney
General,
                           *Respondent.*

No. 05-77141

Agency No.
A95-179-012

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
February 8, 2008—Pasadena, California

Filed September 16, 2008

Before: Harry Pregerson and Kim McLane Wardlaw,
Circuit Judges, and Glenn L. Archer, Jr.,*
Senior Circuit Judge.

*The Honorable Glenn L. Archer, Jr., Senior United States Circuit Judge for the Federal Circuit, sitting by designation.

12873

Opinion by Judge Pregerson

## COUNSEL

Howard R. Davis, Davis, Miller & Neumeister, Van Nuys, California, for the petitioner.

Peter D. Keisler, Assistant Attorney General, Civil Division; Richard M. Evans, Assistant Director; Nancy E. Friedman, Office of Immigration Litigation, Civil Division, Washington, D.C., for the respondent.

## OPINION

PREGERSON, Circuit Judge:

Artur Karapetyan ("Karapetyan"), a native of the Soviet Union and a citizen of Armenia, petitions for review of a final order by the Board of Immigration Appeals ("BIA") that summarily affirmed the Immigration Judge's ("IJ") denial of Karepetyan's application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") (No. 05-75865). Karapetyan also petitions for review of the BIA's denial of his motion to reconsider its decision (No. 05-77141). We have jurisdiction under 8 U.S.C. § 1252. We grant relief and remand for further proceedings consistent with this opinion.

## STANDARD OF REVIEW

Because the BIA adopted and affirmed the decision of the IJ, this court also reviews the IJ's decision. *See Hoque v. Ashcroft*, 367 F.3d 1190, 1194 (9th Cir. 2004). We review questions of law de novo, *Baballah v. Ashcroft*, 367 F.3d 1067, 1073 (9th Cir. 2004), and factual findings for substantial evidence, *Mejia-Paiz v. INS*, 111 F.3d 720, 722 (9th Cir. 1997). We review the IJ's decision to deny a request for continuance for abuse of discretion. *Nakamoto v. Ashcroft*, 363 F.3d 874, 883 n.6 (9th Cir. 2004); *see also Baires v. INS*, 856 F.2d 89, 91 (9th Cir. 1988). We also review a denial of a motion to reconsider for abuse of discretion. *INS v. Doherty*, 502 U.S. 314, 324 (1992). We will reverse the denial of a motion to reconsider if it is "arbitrary, irrational, or contrary to law."

*Singh v. INS*, 295 F.3d 1037, 1039 (9th Cir. 2002) (internal quotation marks omitted).

PROCEDURAL AND FACTUAL BACKGROUND

I. KARAPETYAN'S BACKGROUND

Karapetyan is a native of the Soviet Union and a citizen of Armenia. He was admitted as a visitor to the United States on December 25, 2000 and obtained permission to remain until June 24, 2001. He remained in the United States beyond June 24, 2001 without authorization. On February 6, 2002, the Department of Homeland Security ("DHS") (formerly INS) issued a Notice to Appear, which charged Karapetyan with being present in the United States in violation of 8 U.S.C. § 1227(a)(1)(B).

At a master calendar hearing on March 19, 2002, Karapetyan conceded the charge of removability. The IJ designated Armenia as the country of removal. Karapetyan sought immigration relief in the form of asylum, withholding of removal, CAT relief, and, alternatively, voluntary departure.

On June 10, 2004, the IJ held a merits hearing. There, Karapetyan testified and submitted documentary evidence in support of his applications for relief.

II. KARAPETYAN'S TESTIMONY

The IJ determined that Karapetyan testified credibly during the merits hearing, stating "the [IJ] notes that the [petitioner] has testified in a credible manner." Where the IJ finds the applicant's testimony to be credible and the BIA makes no contrary finding, we accept as undisputed the applicant's testimony. *Baballah*, 367 F.3d at 1073. Thus, we accept the testimony recounted below as true.

Karapetyan was born to a family of mixed ethnicity, with a Russian mother and an Armenian father. When he was a

teenager, Karapetyan and his family moved to Yerevan, Armenia to escape the war in Chechnya. In Armenia, Karapetyan's family suffered humiliation and discrimination on account of its mixed ethnicity. Karapetyan was called a "Russian pig," a "Chechnyan bastard," and a "Chechnyan pig" by people in his community and by members of the military.

While completing mandatory military service, Karapetyan was routinely assigned to dirty, demeaning tasks by supervisors who knew of his mixed ethnicity. He was also beaten by military members. When the military officers learned that Karapetyan submitted written complaints about his treatment, Karapetyan was beaten and locked in a cell.

In April 2000, Karapetyan joined the 21st Century Party, a political association led by Arkady Vardanyan ("Vardanyan") that sought governmental change and championed human rights. In October 2000, Karapetyan participated, as a member of the 21st Century Party, in a large protest involving at least 10,000 attendees. Several protesters were arrested, including the 21st Century Party leader, Vardanyan, and his attorney.[1]

The day following the protest, military officers searched Karapetyan's home and arrested him. He was detained in isolation for three days.[2] While in prison, Karapetyan was interrogated regarding his involvement with the 21st Century Party. The military officers called Karapetyan a "Russian pig." They used batons to beat the soles of Karapetyan's feet

---

[1]Although credible testimony need not be corroborated, *Ladha v. INS*, 215 F.3d 889, 901 (9th Cir. 2000), this testimony was corroborated by a newspaper article from Armenian *New Armenia*, vol. X, issue 7, Jan. 11, 2001, that describes the detention of Vardanyan. Additionally, the State Department Report confirms that roughly 10,000 people attended Vardanyan's rally to seek governmental change.

[2]This testimony was corroborated by a letter from the Ministry of National Security of Republic of Armenia, which confirms that Karapetyan was arrested and detained in isolation for three days for his association with the 21st Century Party.

until he eventually agreed to sign false papers stating that the 21st Century Party was an illegal organization and its leader, Vardanyan, was a Russian spy.

After his release from prison, Karapetyan spoke out against his treatment on a radio station on November 10, 2000. He criticized the Armenian government and called upon others to demonstrate against the government.

Two days later, on November 12, 2000, four law enforcement officers came to Karapetyan's home and beat him "like a dog," leaving bruises on his face and other parts of his body. Karapetyan was hospitalized for injuries caused by those beatings.[3] The law enforcement officers told Karapetyan to leave the country. They told him that, if he refused to leave, he would be put in prison or "something else [would] happen" to him. Karapetyan believed he was in grave danger if he remained in Armenia, and so he obtained a B-1/B-2 visa from the United States Embassy on December 6, 2000. He arrived in the United States on December 25, 2000.

Thereafter, Karapetyan applied for asylum, withholding of removal, and CAT relief. He applied for voluntary departure in the alternative.

## III.   IJ AND BIA DECISIONS

The IJ denied Karapetyan's request for asylum, withholding of removal, and CAT relief, but granted the limited relief of voluntary departure. As a basis for the decision, the IJ found that Karapetyan was not statutorily eligible for asylum because he had failed to show that he was a refugee. Alternatively, the IJ found that Karapetyan was ineligible for asylum because he had failed to submit his fingerprints for a security

---

[3]This testimony was corroborated by an Armenia Republican Hospital report stating that Karapetyan had been beaten in his residence, "suffered numerous bruises and injuries," and was hospitalized for one day.

check. Karapetyan moved for a continuance so that he could submit the fingerprints, but the IJ denied his request.

Karapetyan appealed to the BIA, which affirmed the results without opinion. The BIA subsequently denied Karapetyan's motion to reconsider. Karapetyan timely appealed both decisions.

## DISCUSSION

### I. THE IJ ERRONEOUSLY REQUIRED CORROBORATING EVIDENCE DESPITE FINDING THAT KARAPETYAN HAD TESTIFIED CREDIBLY

We begin by recognizing that the IJ erred when she required corroborating evidence despite finding that Karapetyan had testified credibly. At the conclusion of Karapetyan's merits hearing, the IJ made an express finding that Karapetyan had testified credibly. The IJ concluded, "the [petitioner] has testified in a credible manner."[4]

Yet, the IJ failed to credit Karapetyan's testimony, in part because he did not provide corroborating documentary evidence of his persecution. Pointing to the lack of corroborating documentary evidence, the IJ concluded that Karapetyan had failed to show that he was statutorily eligible for relief. The IJ's oral decision is laden with references to the lack of certain documents. *See* Administrative Record (noting petitioner's "fail[ure] to present any documents establishing that [petitioner] was a member of the 21st Century Party") (noting petitioner "brought no documents establishing that he was

---

[4]The IJ's remark that she did "not know what to believe about [Karapetyan's] claim" does not constitute a specific adverse credibility finding. *See Kalubi v. Ashcroft*, 364 F.3d 1134, 1137-38 (9th Cir. 2004) ("[I]t is clearly our rule that when the IJ makes implicit credibility findings in passing, . . . this does not constitute a credibility finding.") (internal quotation and citation omitted).

[ ]ever a member of the 21st Century Party.") (noting petitioner "has presented no documents establishing that there ever was . . . a rally")**⁵** (noting petitioner "did not present his passport") (noting petitioner "has supplied no documents, whatsoever, to establish that he ever served in the military") (noting petitioner "did not present anything from his friends at the radio station that he ever gave any kind of speech or talk on the radio"). The IJ denied Karapetyan relief, in part because he did not produce these corroborating documents.**⁶**

**[1]** Because the IJ made a finding that Karapetyan testified credibly, the IJ's failure to credit Karapetyan's testimony was improper. We have repeatedly held that, when an applicant has been found to testify credibly, the facts are deemed to be true, and no further corroboration is required.**⁷** *See, e.g.,*

---

**⁵**Contrary to the IJ's assertion, Karapetyan had submitted a State Department Report, which states, "[i]n October 2000, Arkady Vardanyan [the leader of the 21st Century Party], a Moscow-based Armenian businessman who is a Russian citizen, led a demonstration in Yerevan of approximately 10,000 persons calling for the removal of the Government."

**⁶**It is worth noting that the IJ erred in her evaluation of the corroborating documents that were submitted. In her oral decision, the IJ remarked, "[t]he [petitioner] did have some documents that would help establish his claim, but he failed to have them authenticated." Yet, the IJ never ruled on the admissibility of several documents — including his birth certificate, the hospital report, and the letter from the Ministry of National Security — and instead gave Karapetyan an opportunity to authenticate them through his testimony. Moreover, failure to obtain consular certification of foreign official records under 8 C.F.R. § 287.6 is not a basis to exclude corroborating documents. *Khan v. INS*, 237 F.3d 1143, 1144 (9th Cir. 2001). Finally, some documents sought by the IJ were not easily available. *See Sidhu*, 220 F.3d at 1091-92 ("[C]orroborating affidavits from relatives or acquaintances living outside of the United States . . . [are] almost never easily available.").

**⁷**In limited circumstances, the failure to corroborate testimony with documentary evidence can justify an adverse credibility determination, *see Sidhu v. INS*, 220 F.3d 1085, 1090 n.2 (9th Cir. 2000) (upholding an adverse credibility determination where the "applicant inexplicitly fail[ed] to present easily available, material, non-duplicative, corroborating evidence to support his asylum claim), but that is clearly not the case here. In this case, the IJ specifically found Karapetyan to have testified credibly. *See Ladha v. INS*, 215 F.3d 889, 900 n.11 (9th Cir. 2000).

*Kataria v. INS*, 232 F.3d 1107, 1113 (9th Cir. 2000) ("[W]e must accept testimony as true in the absence of an explicit adverse credibility finding."); *Ladha v. INS*, 215 F.3d 889, 901 (9th Cir. 2000) (reaffirming that "corroboration of credible testimony is not necessary"); *Lopez-Alvarado v. Ashcroft*, 381 F.3d 847, 855 (9th Cir. 2004). In fact, the IJ acknowledged, "[t]he [petitioner's] testimony alone can establish that he is a refugee."

**[2]** Because corroborating evidence is not necessary in the face of a credibility finding, we accept Karapetyan's testimony as true.

## II.  THE IJ'S CONCLUSION THAT KARAPETYAN WAS INELIGIBLE FOR ASYLUM RELIEF IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

Accepting Karapetyan's testimony as true, we must next address whether substantial evidence supported the IJ's finding that Karapetyan's testimony was insufficient to warrant asylum relief.[8] We find that the harm suffered by Karapetyan compels a finding of past persecution and, accordingly, we remand the case to the BIA to exercise its discretion in deciding whether to grant asylum.

This court reviews for substantial evidence the IJ's decision that an applicant has failed to establish past persecution or a well-founded fear of persecution. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). To obtain reversal under this standard, the petitioner must demonstrate that the evidence presented was such that a reasonable fact finder would be compelled to conclude that the requisite past persecution, or well-founded fear of future persecution, existed. *Id.*

**[3]** To be eligible for a grant of asylum, Karapetyan must show that he is a refugee. 8 U.S.C. § 1158(b)(1). A refugee

---

[8]The government's brief avoids this issue entirely.

is one who is "unable or unwilling to avail himself or herself of the protection of [his or her native] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

"Either past persecution or a well-founded fear of future persecution provides eligibility for a discretionary grant of asylum." *Ratnam v. INS*, 154 F.3d 990, 994 (9th Cir. 1998). To show past persecution, Karapetyan must demonstrate that (1) his treatment rises to the level of persecution; (2) the persecution was on account of one or more protected grounds; and (3) the persecution was committed by either the government or by forces that the government was unable or unwilling to control. *Chand v. INS*, 222 F.3d 1066, 1073 (9th Cir. 2000). To show a well-founded fear of persecution, Karapetyan must demonstrate that (1) he has a fear of persecution in his country; (2) there is a reasonable possibility of suffering such persecution; and (3) he is unable or unwilling to return to that country because of such fear. *See* 8 C.F.R. § 1208.13(b)(2). The demonstration of past persecution creates a rebuttable presumption that the applicant has a well-founded fear of persecution on the basis of the original claim. *See id.* § 208.13(b)(1).

**[4]** Here, Karapetyan provided uncontroverted evidence of his past persecution — which included physical and verbal abuse — on account of his mixed Armenian-Russian ethnicity and membership in a disfavored political party. He testified that he was detained by the military, beaten by officers, called derogatory names, and assigned to demeaning tasks because his mother was Russian. Karapetyan further testified that he was detained in isolation, beaten, hospitalized for injuries, and warned to leave the country because of his association with the 21st Century Party, a political organization that sought political change in Armenia and advocated for human rights.

The IJ's conclusion that Karapetyan is not statutorily eligible for asylum is not supported by substantial evidence. As

we discuss further below, the IJ made a series of factual and legal errors in reaching her conclusion that Karapetyan was not statutorily eligible for asylum.

A.    *Past Persecution*

**[5]** The IJ's conclusion that Karapetyan failed to show past persecution is not supported by substantial evidence. The record indicates that the IJ arrived at this conclusion only by misunderstanding the record and misapplying the law. *See Smolniakova v. Gonzales*, 422 F.3d 1037, 1045-46 (9th Cir. 2005) (granting relief and criticizing IJ for misconstruing the record).

**[6]** For example, with regard to Karapetyan's three-day detention, the IJ stated, "his testimony did not indicate that he was beaten."[9] This pronouncement overlooks the facts in the record. On direct examination, Karapetyan stated, "For three days, they would not let me talk to anybody, no phone calls, anything, nothing. They [sic] investigating person was [sic] beating me in their cells."

The IJ also assumed that Karapetyan's injuries, which resulted from his three-day detention in early November 2000, were not significant because Karapetyan did not seek medical attention.[10] But Karapetyan never testified as to whether he sought medical treatment on that occasion. The IJ's conclusion that Karapetyan did not seek treatment was nothing more than conjecture and, thus, cannot support the IJ's decision. *See, e.g.*, *Lopez-Reyes v. INS*, 79 F.3d 908, 912 (9th Cir. 1996) (explaining that "conjecture is not a substitute for substantial evidence").

---

[9]Later in her decision, the IJ stated that Karapetyan's testimony "did not establish that he was at any time beaten." And, again, she stated, "the [petitioner] did not testify that he was beaten during detention . . . ."

[10]The IJ accepted as true Karapetyan's testimony that he was hospitalized after another series of beatings that took place in his home.

Moreover, an applicant's failure to "seek medical treatment for the [injury] suffered is hardly the touchstone of whether [the harm] amounted to persecution." *Lopez v. Ashcroft*, 366 F.3d 799, 803 (9th Cir. 2004). We have repeatedly found that threats and attacks constitute past persecution even where an applicant has not been beaten or physically harmed. *See, e.g.*, *Surita v. INS*, 95 F.3d 814, 819 (9th Cir. 1996) (concluding that the petitioner had established persecution when the evidence showed that she had been robbed numerous times in the course of seven to ten days but not physically harmed).

Misconstruing the record again, the IJ stated that there were "no documents" establishing that the October 2000 demonstration, involving the 21st Century Party leader, Vardanyan, had occurred. The IJ specifically stated that Karapetyan had produced no reports regarding the rally. However, contrary to the IJ's assertion, Karapetyan submitted the State Department Report, which the IJ admitted into the record. The Report states:

> In October 2000, Arkady Vardanyan [the leader of the 21st Century Party], a Moscow-based Armenian businessman who is a Russian citizen, led a demonstration in Yerevan of approximately 10,000 persons calling for the removal of the Government. After the demonstration, security forces searched Vardanyan's house and took him into custody; he was sentenced to 11 days detention on the charge that he had a permit for a demonstration but not a march. In November 2000, Vardanyan was charged with attempting a coup. . . . In February Vardanyan was released, cleared of charges and his case was closed. Soon after his release, Vardanyan left the country.

**[7]** The IJ also erred by failing to consider the cumulative impact of the various incidents. Although the IJ described the beatings, threats, and verbal abuse inflicted upon Karapetyan, she erroneously dismissed each incident alone as insufficient

to establish persecution. Addressing each incident separately, the IJ stated, "a short detention with no injuries does not establish that the [petitioner] was persecuted on account of his political opinion." Later in the decision, the IJ stated, "offensive names . . . do[ ] not rise to the level of persecution." And, again later in the decision, the IJ remarked, "[petitioner's] claim that he served in the military and was given poor treatment does not rise to the level of persecution."

**[8]** An applicant may suffer persecution because of the cumulative impact of several incidents even where no single incident would constitute persecution on its own. *Shirazi-Parsa v. INS*, 14 F.3d 1424, 1428 (9th Cir. 1994), *overruled on other grounds by Fisher v. INS*, 79 F.3d 955 (9th Cir. 1996). The court "look[s] at the totality of the circumstances in deciding whether a finding of persecution is compelled." *Guo v. Ashcroft*, 361 F.3d 1194, 1203 (9th Cir. 2004) (finding persecution where Chinese Christian was arrested, detained twice, physically abused, and forced to renounce religion). This court has found that the severity of harm is compounded when incidents of persecution have occurred on more than one occasion, particularly when "an applicant . . . is victimized at different times over a period of years." *Chand*, 222 F.3d at 1073-74. Taken cumulatively, the brutal beatings, the hospitalization, the threats of harm, the isolated detention, and the verbal insults compel a finding of persecution in this case.

B.    *On Account of Mixed Ethnicity and Political Opinion*

**[9]** Likewise, the facts in the record compel the finding that Karapetyan was persecuted on account of his mixed ethnicity and political opinion.[11]

---

[11]The persecution of children due to their mixed parentage is on account of a protected ground. *Maini v. INS*, 212 F.3d 1167, 1175 (9th Cir. 2000); *see also Shoafera v. INS*, 228 F.3d 1070, 1074 n.2 (9th Cir. 2000) ("[T]he term ethnicity describes a category which falls somewhere between and within the protected grounds of race and nationality.") (internal quotation marks omitted).

The IJ acknowledged that Karapetyan "was always being ignored and being ordered to carry out the most dirtiest jobs, such as cleaning restrooms and polishing military boots of the officers." Nonetheless, the IJ determined that "it is not clear" that Karapetyan was assigned insulting tasks during his military service on account of his mixed ethnicity.

**[10]** The IJ erred when she required Karapetyan to clearly establish the motives of his persecutors. Because it is difficult to conclusively prove motive, Karapetyan need only "provide *some* evidence of [motive], direct or circumstantial," *Elias-Zacarias*, 502 U.S. at 483, and demonstrate the connection between the government's actions and his membership in a protected group, *Fisher*, 79 F.3d at 962. "[U]ncontroverted and credible testimony is sufficient to establish that [an asylum applicant] was persecuted on account of ethnicity." *Shoafera v. INS*, 228 F.3d 1070, 1075 (9th Cir. 2000). Under this standard, Karapetyan need only provide some evidence that his persecutors were motivated by his mixed ethnicity or, alternatively, his political opinion.

**[11]** Karapetyan was called a "Russian pig," a "Chechnyan bastard," and a "Chechnyan pig" while being persecuted. The use of these slurs amply establishes the connection between the acts of persecution and Karapetyan's ethnicity. *See, e.g.*, *Duarte de Guinac v. INS*, 179 F.3d 1156, 1162 (9th Cir. 1999) (noting that motivation was on account of ethnicity where persecution was "coupled with explicit expressions of ethnic hatred").

**[12]** Additionally, there is an undeniable connection between Karapetyan's political activities and his persecution. His arrest occurred just one day after he attended the 21st Century Party protest. Karapetyan's captors physically abused Karapetyan to coerce him to confess that the 21st Century Party was an illegal organization. The nexus between Karapetyan's political activism and the persecution is also estab-

lished by the beatings he endured in his home just a few days after he criticized the government over the radio.

**[13]** We find that Karapetyan has shown credible, non-speculative insight into the motivation of his persecutors. *See Shoafera*, 228 F.3d at 1075. The use of derogatory slurs and the close connection between political events and persecution demonstrate that Karapetyan's abusers were motivated to persecute him based on his mixed ethnicity and political opinion.

## C. *Perpetuated by the Armenian Government*

We further conclude that the IJ's conclusion that the persecution was not perpetuated by the Armenian government is not supported by substantial evidence.

**[14]** The applicant must demonstrate that the persecutor was the government, a quasi-official group, or persons or groups that the government is unwilling or unable to control to qualify for asylum. *See Avetova-Elisseva v. INS*, 213 F.3d 1192, 1196 (9th Cir. 2000). Affirmative state action is not necessary to establish a well-founded fear of persecution if the government is unable or unwilling to control the agents of persecution. *Siong v. INS*, 376 F.3d 1030, 1039 (9th Cir. 2004). We will presume that the persecution was perpetrated by government agents where there is no evidence to the contrary and where there is no evidence of hostility between the applicant and non-governmental actors. *See Njuguna v. Ashcroft*, 374 F.3d 765, 772 (9th Cir. 2004).

The IJ expressed disbelief that the Armenian government would persecute Karapetyan and other members of the 21st Century Party — stating, as the basis for her decision, "[i]t simply makes no sense that . . . authorities in Armenia would then come after [Karapetyan] after he is a member of an illegal organization."[12]

---

[12]The IJ also denied CAT relief on this ground, citing Karapetyan's failure to establish that the perpetrators were public officials.

**[15]** But the State Department Report corroborates the human rights violations in Armenia during the relevant time. The Report specifically discusses the Armenian government's targeting of Vardanyan, the 21st Century Party's leader, who was detained, accused of starting a coup, and coerced to leave Armenia.[13]

**[16]** The IJ also expressed doubt that the men who invaded Karapetyan's home and beat him on November 10, 2000 were government actors. Yet, Karapetyan testified that he knew that the men were police officers. Karapetyan also testified, and the IJ accepted as true, that he had endured beatings at the hands of the Armenian military earlier that month. And the State Department Report confirms that the Armenian government did not always respect the constitutional prohibition of unauthorized searches. The IJ provided no reason for rejecting these facts, and it is pure speculation to assume that the later beating of Karapetyan was perpetrated by non-governmental agents, unlike the earlier beating, where no testimony or evidence supports that finding.

**[17]** An IJ's unsupported speculations regarding the likely actions of a foreign government are not substantial evidence. Such conjecture is an invalid basis for the decision. *See Bandari v. INS*, 227 F.3d 1160, 1168 (9th Cir. 2000). Thus, we conclude that the evidence in the record compels the conclusion that Karapetyan's mistreatment was at the hands of the government.

D.   *Well-Founded Fear of Future Persecution*

**[18]** Because Karapetyan has established past persecution on account of his mixed ethnicity and political opinion, there is a rebuttable presumption that he has a well-founded fear of

---

[13]The Report states, "After [the October 2000] demonstration, security forces searched Vardanyan's house and took him into custody . . . . In November 2000, Vardanyan was charged with attempting a coup."

future persecution. The government bears the burden of demonstrating by a preponderance of the evidence that changed country conditions rebut the presumption of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1)(i). The government has never claimed that country conditions have changed, and nothing in the record suggests that they have. Accordingly, the government has failed to meet its burden. *See, e.g.*, *Chand*, 222 F.3d at 1078 ("[R]emand is not appropriate where the record clearly shows that the country conditions material in the record will not serve to rebut the presumption."); *Navas v. INS*, 217 F.3d 646, 662 (9th Cir. 2000) (holding that a remand is unnecessary where past persecution has been established "but the INS has failed to introduce the requisite country conditions information and thus has failed to meet its evidentiary burden on that issue . . . .").

**[19]** We therefore conclude that Karapetyan is statutorily eligible for asylum and remand solely for the Attorney General to exercise his discretion to grant asylum.

III.  THE IJ'S CONCLUSION THAT KARAPETYAN IS INELIGIBLE FOR OTHER FORMS OF RELIEF IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

**[20]** The IJ based her finding that Karapetyan was ineligible for withholding of removal and CAT relief upon her faulty conclusion that Karapetyan had failed to meet the more lenient standard for asylum relief. For the reasons discussed in Section II, the IJ erred as to the substance of the asylum claim. Thus, we remand for a determination of whether Karapetyan is eligible for withholding of removal and CAT relief.

IV.  THE IJ IMPROPERLY DENIED KARAPETYAN'S MOTION FOR A CONTINUANCE TO COMPLY WITH THE FINGERPRINTING REQUIREMENTS

As an alternate basis for the denial of relief, the IJ found that Karapetyan was ineligible for relief because he had not

submitted fingerprints. Karapetyan moved for a continuance so that he could submit his fingerprints. The IJ denied the motion for a continuance.

### A. *The IJ Abused Her Discretion in Denying the Continuance*

The IJ abused her discretion in denying Karapetyan's request for a continuance so that he could submit fingerprints.

**[21]** Under 8 C.F.R. § 1003.29, an IJ "may grant a motion for continuance for good cause shown." In the context of immigration proceedings, the decision to grant or deny continuances is in the sound discretion of the trial judge. *See Nakamoto*, 363 F.3d at 883 n.6 (9th Cir. 2004); *see also Baires*, 856 F.2d at 91. But the IJ's discretion is limited. *Baires*, 856 F.2d at 91 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). We will reverse an IJ's decision should we conclude that her ruling results from "an abuse of discretion." *Id.*

When evaluating an IJ's denial of a motion for continuance we consider a number of factors — including, for example, (1) the importance of the evidence; (2) the reasonableness of the immigrant's conduct; (3) the inconvenience to the court; and (4) the number of continuances previously granted in the case. *See Baires*, 856 F.2d at 92-93; *cf. United States v. Flynt*, 756 F.2d 1352, 1358-59 (9th Cir. 1985) (listing factors appellate court considers when reviewing district court's denial of request for continuance), *amended*, 764 F.2d 675 (9th Cir. 1985).

**[22]** We recently evaluated these factors in a similar case, *Cui v. Mukasey*, No. 05-72185, slip op. 11043 (9th Cir. Aug. 19, 2008), in which we held that the IJ abused his discretion in denying the immigrant's request for a short continuance to submit fingerprints. Although a decision whether a denial of a continuance constitutes an abuse of discretion must be

resolved on a case by case basis, *Baires*, 856 F.2d at 91, *Cui*
established that "it is clearly an abuse of discretion for an IJ
to deny a request from an otherwise diligent applicant for a
short continuance to submit fingerprints, particularly where
the applicant was faced with an unclear fingerprint require-
ment and where the applicant was disserved by an IJ's inade-
quate guidance on the requirement." *Cui,* slip op. at 11056.

### 1.  *Nature of the Excluded Evidence*

**[23]** We first consider the evidence that was excluded as a
result of the IJ's denial of Karapetyan's motion for a continu-
ance. The denial of the continuance meant that Karapetyan
was unable to submit fingerprints for the required security
check. Without a security check, Karapetyan could not be
granted relief under the law. Thus, when the IJ denied his
request for a continuance to submit fingerprints, the IJ effec-
tively pretermitted any hope Karapetyan had of obtaining
relief. The vital importance of the excluded fingerprint evi-
dence counsels in favor of granting a continuance. *See Cui*,
slip op. at 11051.

### 2.  *Petitioner's Conduct*

Another factor we consider is whether the need for a con-
tinuance arose because the petitioner behaved unreasonably.
We find that Karapetyan's conduct was not unreasonable,
given the circumstances.

First, Karapetyan showed that exceptional circumstances
prevented him from complying with the fingerprint require-
ment. *See Baires*, 856 F.2d at 92-93; *see also* 8 C.F.R.
§ 1208.10 (requiring the applicant to show "good cause" for
a continuance). When Karapetyan was asked by the IJ why he
did not submit fingerprints, he explained that he suffered a
debilitating injury from a car accident on April 4, 2004 —
about two months prior to the merits hearing, which was held
on June 10, 2004. Karapetyan explained that he had injured

his back and neck as a result of the car accident. He had regular doctor appointments twice per week and experienced difficulty sitting upright for the first two months. As of June 10, 2004, the date of the merits hearing, Karapetyan was still taking antibiotics and painkillers for his injuries.

Second, as we have previously recognized, the ability of otherwise diligent applicants, like Karapetyan, to comply with the fingerprint requirement was frustrated by the legal uncertainties surrounding the fingerprint laws. *See Cui*, slip op. at 11051. The IJ denied Karapetyan's motion for a continuance in June 2004, when the laws addressing fingerprinting were still unclear.[14]

Third, Karapetyan did not receive adequate notice regarding the fingerprint requirement. On May 8, 2003, the government informed the IJ that Karapetyan had not been fingerprinted. The IJ told Karapetyan's attorney, Rita Mahdessian, "before we *conclude* this case, you need to have your client fingerprinted." (emphasis added). Attorney Mahdessian replied, "I will." The IJ never said that the fingerprints had to be submitted before the *beginning* of the merits hearing.

The vague statement made by the IJ certainly would not meet the notice standards under existing law. As a result of the confusion over the fingerprint requirement, the EOIR pro-

---

[14]In January 2005, the Executive Office for Immigration Review ("EOIR") acknowledged that the consequences of failing to complete fingerprint security checks in advance of the merits hearing were unclear under existing regulations. *See* 70 Fed. Reg. 4743, 4744 (Jan. 31, 2005). The EOIR proposed changes to the existing regulations while acknowledging that 8 C.F.R. § 1003.29 "leaves numerous questions unanswered in the complicated area of criminal history checks and national security investigations." *Id.* The EOIR admitted, "[t]he current regulations are also unclear as to the scope of an immigration judge's authority to act to grant relief in situations where a background investigation is ongoing." *Id.* In practice, IJs did not always require fingerprint checks be completed in advance of the merits hearing. The state of the law is described in greater detail in our recent decision, *Cui*, slip op. at 11051-52.

posed a new rule, effective April 1, 2005, that required IJs to ensure that applicants understand the fingerprint requirements and the consequences of noncompliance by specifying for the record (1) when the applicant received the fingerprint notice and instructions from DHS, and (2) the consequences for failing to submit the required fingerprints. *See* 8 C.F.R. § 1003.47(d). Neither was done in this case.[15]

[24] Under the totality of the circumstances, we conclude that Karapetyan's failure to submit fingerprints prior to his merits hearing was reasonable.

### 3. *Inconvenience to the Court*

We also consider whether the requested continuance would inconvenience the immigration court. Here, it is quite clear that neither the IJ nor the government would have been inconvenienced by a short continuance. The IJ had already heard the merits of Karapetyan's claims. If she had found Karapetyan worthy of relief, she could have simply held the decision in abeyance pending submission of Karapetyan's fingerprints

---

[15]Moreover, it is questionable whether Karapetyan received adequate guidance from his trial counsel on this issue of unsettled law. During the proceedings before the IJ, Karapetyan was represented by Rita Mahdessian. Mahdessian has been disciplined by the State Bar of California and was issued an actual suspension in September 1996 and, again, in November 2005. *See* State Bar of California, Attorney Search, Rita Mahdessian, http://members.calbar.ca.gov/search/member_detail.aspx?x=141901. In September 1996, Mahdessian was found culpable of an act of moral turpitude, filing fraudulent amnesty applications, and possession of a counterfeit employment authorization card. *Id.* In November 2005, Mahdessian stipulated to six counts of misconduct in two cases. She admitted that she aided in the unauthorized practice of law by abdicating control of her office to her staff, failed to perform legal services competently, failed to keep her client informed of developments in his case, and "employed . . . means inconsistent with the truth" by telling the court she had just been hired. Stipulation Regarding Facts, Conclusions of Law and Disposition and Order Approving, No. 02-O-14394, at 10 (effective Nov. 12, 2005), *available at* http://members.calbar.ca.gov/courtDocs/02-O-14394.pdf.

and then scheduled a brief hearing to hear the results of the security check. Thus, this factor also supports granting Karapetyan's request for a continuance.

### 4. *Previous Continuances*

When evaluating the denial of a continuance, we also consider the length and number of continuances that have previously been granted in the case. Here, the proceedings had been ongoing for about two years. On March 19, 2002, Karapetyan requested a ninety-day continuance to supplement his asylum application. On June 13, 2002, Karapetyan requested another continuance to submit additional documents. On February 13, 2003, Karapetyan requested a continuance to submit additional documentation explaining that country conditions had recently changed. On May 8, 2003, the merits hearing was continued, by mutual agreement, to September 2, 2003. The record does not indicate why the merits hearing did not take place on September 2, 2003 as scheduled. On March 24, 2004, Karapetyan's counsel withdrew. On April 16, 2004, Karapetyan did not appear for the merits hearing because he had suffered debilitating injuries from a car accident two weeks earlier, and the matter was reset for June 10, 2004. The merits hearing was eventually held on June 10, 2004, and the IJ denied Karapetyan's motion for a short continuance to submit fingerprints after the hearing concluded.

Although Karapetyan's case had been continued previously, the interest in administrative efficiency cannot justify the pretermission of Karapetyan's claims where the other factors we have addressed — the importance of the evidence excluded, the reasonableness of the petitioner's conduct, and the inconvenience to the immigration court — all militate strongly in Karapetyan's favor.

Accordingly, we conclude that the IJ abused her discretion when she denied Karapetyan's motion for a continuance.

B.  *The IJ's Denial of the Continuance was Improper to the Extent the Decision was Based on an Erroneous Assessment of the Underlying Claim*

The IJ indicated that the denial of the continuance was based on her assessment of Karapetyan's eligibility for relief. The IJ suggested that she might reconsider the denial of the continuance based on her assessment of the underlying claim. She stated, "All right, we'll [take] the testimony today and if for any reason, it looks like a continuance might be required, we'll consider that at the end of the testimony." In her oral decision, following the merits hearing, the IJ revisited the issue and denied the motion for a continuance because "after hearing [Karapetyan's] claim," the IJ determined that he "does not appear eligible for asylum in any event."

**[25]** In light of the legal errors committed by the IJ during her evaluation of Karapetyan's claim for asylum, we find the IJ's denial of a continuance is improper to the extent that the decision was based on the IJ's flawed analysis of Karapetyan's claims for relief.

V.  THE BIA ABUSED ITS DISCRETION WHEN IT DENIED KARAPETYAN'S MOTION TO RECONSIDER

We also conclude that the BIA abused its discretion when it denied Karapetyan's motion to reconsider. The BIA asserted that it was denying the motion to reconsider because the motion failed to present new legal arguments. It stated, "[w]e find no new legal argument presented nor any particular aspect of [the] case that was overlooked in our previous decision. Accordingly, the motion will be denied."

**[26]** There is no basis for the BIA's finding that "no new legal argument" was presented. A comparison of petitioner's appellate brief to the BIA and his subsequent motion for reconsideration demonstrates that although the motion for

reconsideration reiterated many of the arguments that had previously been presented to the BIA, it also raised new claims. For example, it argued, for the first time, that the IJ had improperly denied Karapetyan's motion for a continuance to take fingerprints. It also argued, for the first time, that the IJ violated Karapetyan's right to procedural due process in denying the motion for a continuance. Moreover, the motion for reconsideration drew the BIA's attention to additional facts from the record and supplemental case citations.

**[27]** We therefore conclude that the BIA abused its discretion in denying the motion for reconsider on the grounds that the motion failed to present new arguments or aspects of the case. Nonetheless, because we are granting Karapetyan's other petition, we need not remand to the BIA on these grounds.

## CONCLUSION

For these reasons, we conclude that Karapetyan is statutorily eligible for asylum relief. We also find that the IJ abused her discretion in denying Karapetyan's motion for a continuance so that he could submit fingerprints. We remand for proceedings consistent with this opinion.

REVERSED and REMANDED.